(No. 18612.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CLIFF HATCHER *et al.* Plaintiffs in Error.

*Opinion filed April 20, 1929.*

D. L. DUTY, GEORGE T. CARTER, and E. N. BOWEN, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, A. O. BOSWELL, State's Attorney, and ROY D. JOHNSON, (C. R. SMITH, of counsel,) for the People.

Mr. COMMISSIONER PARTLOW reported this opinion:

Cliff Hatcher, Charley Sisney and C. A. Brummitt were indicted in Williamson county for the murder of Jake Cacciabando on the night of November 26, 1924, about 9:00 o'clock, at the home of Hatcher, in the city of Marion. The indictment was *nollied* as to Sisney and the other two defendants were found guilty. Hatcher was sentenced to the penitentiary for twenty years and Brummitt was sentenced for fifteen years, and they have prosecuted a writ of error from this court, insisting that the judgment is not sustained by the evidence.

Granite street, in the city of Marion, extends north and south and is intersected at right angles by Goodall and White streets. White street is the first street south of Goodall street. Hatcher lived at the southeast corner of Goodall and Granite streets. The deceased lived at the corner of White and Granite streets, one block south of the Hatcher home, and he ran a grocery store. He kept his automobile in a garage in the rear of the home of John Caldaraio, who lived at the northwest corner of Granite and Goodall streets, diagonally northwest from the Hatcher home. John Palazzo lived on the west side of Granite street, opposite the Hatcher home. Herman Gentry, a witness for defendants, testified that on the afternoon of the day in question, about 4:00 or 5:00 o'clock, he met the deceased, who was intoxicated, on a public highway just

north of the city. The deceased asked him if he had seen Hatcher, and wanted to know what was the matter with Hatcher—whether he was crazy, crooked, or what. The deceased said that Hatcher owed him eight dollars and would not pay him. He said he would get even with Hatcher, or that he would get Hatcher. Gentry testified that on the same day, between 5:00 and 6:00 o'clock, he told Hatcher of this conversation. Tony Diliberto, a witness for the People, testified that he was with the deceased from 7:00 o'clock in the morning until 5:00 o'clock in the afternoon of the day in question, and the witness did not know Gentry. Several witnesses for the People testified that on the evening in question, about 6:00 o'clock, the two defendants went to the home of the deceased, but he was not at home at that time. Hatcher denied that he was at the home of the deceased at that hour, but Brummitt did not testify on this point. About 7:00 o'clock on that evening the deceased was eating his supper at his home. There were present the deceased, his wife, his daughters, Val Phelps, who was a delivery boy for the deceased, Tony Diliberto, Mike Cacise, John Palazzo and Roscoe Perry. While they were eating, the two defendants came to the house. They were invited to eat, but refused. They remained fifteen or twenty minutes and left without stating their business. Hatcher testified on the trial that the purpose of this visit was to see the deceased with reference to his alleged conversation with Gentry, and that Gentry told Hatcher of this conversation about 5:00 or 6:00 o'clock on that day. After defendants left the home of the deceased they went to a restaurant, where they met their wives and Sisney. The five of them drove in Hatcher's automobile to the Hatcher home, parked the car in front of the house, on the east side of Granite street, facing north, and all went into the house. The men remained in the front room, talking and reading, and the women went into the kitchen to make some coffee. There is a conflict in the evidence as

to when they reached the Hatcher house. Sisney testified they got there about 8:25 o'clock. Brummitt testified they got there between 7:30 and 8:00 o'clock. Hatcher testified they got there about 8:00 o'clock.

The evidence shows that after the deceased had finished his supper he took Perry and Phelps to their homes in his automobile, about 8:00 or 8:30 o'clock. Perry got out of the car first. When they reached the home of Phelps the deceased and Phelps sat in the car in front of the Phelps home and talked about thirty minutes and the deceased then started home. John Palazzo, his wife and Carlo Bellavia testified that they were on the front porch at the Palazzo home, directly across the street, west, from the Hatcher home, about 9:05 o'clock, when the Chicago and Eastern Illinois passenger train came in, the track being just west of the Palazzo house; that they saw the deceased drive north in his automobile past their house on Granite street and turn west to the garage where he kept his car, at the northwest corner of Granite and Goodall streets; that in a few minutes he came out onto the sidewalk on the west side of Granite street and started to walk south; that when he was in front of the Palazzo house the three witnesses heard somebody from the Hatcher house call, "Jake! Jake! Come here!" One of them testified that the call came from the Hatcher porch. The deceased went across the street to the Hatcher house and entered the front door.

The evidence shows that about 9:00 o'clock, or a little after, the wife of the deceased and her daughter started north on the east side of Granite street. They testified that just before they reached the Hatcher home they saw three men come out of the house, get into the Hatcher automobile, drive north and then turn east in Goodall street. The wife and daughter crossed to the west side of the street before they got to the Hatcher house and went to the garage where the deceased kept his car. They found his automobile in the garage, with the doors locked. They then

went to the Hatcher house, entered the front door and found the deceased lying on the floor, with nobody in the house. They immediately raised the alarm and the neighbors responded. Cacciabando was still alive but was unconscious, and he had five or six bullet wounds in his body. He revived in a few minutes and repeatedly told those present, several of whom testified, that when he came into the house he was seized by Sisney and Brummitt, who held him while Hatcher shot him five or six times. He said that Hatcher shot him down like a dog for nothing; that he did not know what was the matter or why they shot him; that he was not mad at Hatcher but was his friend, and that when he was passing the house they called him in and shot him. He said he was going to die—that he was dying—and he asked his children to kiss him for the last time. He wanted them to get a doctor, as he was in great pain. Most of his talk was in the Italian language, but some of the witnesses testified to some of his statements which were in English. Physicians were summoned immediately and reached the house about 9:30 o'clock. The deceased was removed to the hospital, where he repeated his prior statements as to how he was shot and that he was going to die. He died about one hour after he was shot.

The two defendants and Sisney were the only witnesses who testified for the defense as to what took place at the time of the shooting. They all testified in substance that they did not call the deceased to the Hatcher house; that he came into the house without knocking and was intoxicated; that he insisted that Hatcher pay him an eight-dollar grocery bill; that Hatcher told him he would not pay the bill at that time—that he go home and sober up and Hatcher would settle with him the next day; that the deceased made threats to kill if the amount was not paid; that he stayed for a few minutes, then left the house and was gone about five minutes, when he returned and again made his demand and threats; that he left the house a

second time, was gone about five minutes, and again returned and repeated his threats and demand; that he had his hand under his coat, indicating that he had a revolver; that the two women left the house when the deceased entered the first time, and that when he came back the third time Brummitt put on his overcoat and started to leave the house; that a revolver was sticking out of his overcoat pocket, and as he passed the deceased the latter pulled the revolver from the pocket; that Sisney attempted to grab the arm of the deceased, and in the scuffle the revolver was discharged and Sisney was shot through the hand. Brummitt testified that just after the deceased grabbed his revolver he left the room and immediately the shooting began. Hatcher testified that when the deceased secured Brummitt's revolver Hatcher pulled his gun and fired at the deceased five or six times; that he reeled around the room and finally fell on the floor, and that he shot the deceased in self-defense. They all testified that after the shooting they left the house but all of them did not get into Hatcher's automobile; that Sisney and Hatcher started east on Goodall street on their way to the county jail. Brummitt testified he got in the Hatcher car and drove to the county jail. Sisney went to the office of a doctor to have his wound dressed. Defendants went to the county jail and were locked up.

Sisney and Brummitt testified before the coroner, and there is considerable conflict between their evidence on that occasion and their evidence on the trial. Sisney testified on the trial that they got to the Hatcher house about 8:25; that the deceased came about 8:35 or 8:40; that he did not knock at the door; that when he came into the house he said he wanted the eight dollars to get some white mule; that he was away from the house three or four minutes between the first and second visits and between the second and third visits; that when he was shot he did not fall and was not on the floor when Sisney left the house; that

both women left the house while the deceased was there the first time, and that the deceased fired first. He testified before the coroner that the shooting took place about 9:00 or 9:30; that the deceased was away from the house ten or fifteen minutes between visits; that when he was shot he fell; that only Mrs. Brummitt left before the shooting, and that Hatcher fired the first shot. Brummitt testified on the trial they were at the house twenty or thirty minutes before the deceased came, and that after the shooting Brummitt went into the room and put the deceased on the floor, on his back. Before the coroner he testified that the shooting took place about 9:00 or 9:30 o'clock; that the deceased knocked before coming into the house, and that he was lying on the floor after the shooting.

In support of the motion for a new trial the affidavit of Arthur Oates was filed, in which he swore that he was on Granite street on the night in question and saw the deceased drive his automobile to the garage; that affiant called to the deceased when they were in front of the Hatcher house, saying, "Oh, Jake! Come here!" that affiant told the deceased that he wanted to buy a pint of whiskey, which the deceased sold at that time, and that this took place about 8:00 or 8:30 o'clock.

The evidence conclusively shows that before the shooting defendants were seeking the deceased. Several witnesses for the People testified that defendants called at the house of the deceased at 6:00 o'clock. This was denied by Hatcher, but Brummitt did not deny it. It is conceded that defendants called while the deceased was eating supper. Their mission was evidently not altogether friendly. They wanted to see the deceased with reference to the remarks he was alleged to have made about Hatcher. With so many persons present when they called, defendants had no opportunity to talk to the deceased and left without stating their business. They went down-town, got their wives and Sisney and went to the Hatcher house. The evidence

shows that both defendants were armed at the Hatcher home. How long they had been armed does not appear, but it is not unreasonable to assume, under the facts in evidence, that they were armed when they were at the home of the deceased and that their mission was not friendly. The hour when the deceased went to the Hatcher house and when the shooting took place is very material. The evidence on behalf of defendants on these points is in considerable conflict. They attempted to prove on the trial that the deceased came to the Hatcher house and the shooting took place before 9:00 o'clock, while before the coroner Sisney and Brummitt fixed the time between 9:00 and 9:30. We think the most reliable evidence is that the deceased went to the Hatcher house just a few minutes after the 9:05 Chicago and Eastern Illinois train came in, and that the shooting took place very shortly after the deceased entered the house. The doctors were called almost immediately after the wife of the deceased entered the house, and they arrived about 9:30 o'clock. These facts were established by the evidence of several witnesses, and the evidence on behalf of defendants is in such conflict that little credit can be given to it. If the deceased was shot shortly after he entered the house, that fact disproves the evidence of the defense that he left the house twice after he first entered and that he was gone from three to fifteen minutes each time. Defendants deny that they called the deceased to the house, but the more reliable evidence shows that they did call him. They had been hunting him prior to this time. They had not succeeded in talking to him, and they evidently had the same desire to see him which they had prior to that time. After he got into the Hatcher house, defendants, if their evidence is true, did not say a word to him about his conversation with Gentry with reference to Hatcher. Earlier in the evening they had been seeking him for this particular purpose. It is apparent from the evidence that the deceased was unarmed when he entered the

house and that both defendants were armed. It is improbable that he, if he was unarmed and had no weapon in his possession with which to kill Hatcher, would go into the house three times and make threats to kill him. The evidence on behalf of defendants is that he was extremely drunk, but they were the only witnesses who so testified. It is apparent that he was not so drunk but that he knew where he was going, and he was able to drive his automobile. Sisney testified that the deceased said in the house that he wanted the eight dollars so he could buy white mule, but if the affidavit of Oates is true, the deceased sold Oates a pint of whiskey just before he entered the house and received pay for it. He was therefore not in need of whiskey or money with which to buy it. If the evidence on behalf of the People is true, defendants were guilty of murder. Where the testimony regarding the material facts in issue is in conflict it is the peculiar province of the jury to determine on which side the truth lies, and this court will not substitute its opinion for that of the jury unless it is satisfied that there is a reasonable doubt of guilt. (*People* v. *Stathus,* 303 Ill. 326.) The evidence on behalf of defendants is in such conflict on many material points, it is so inconsistent in itself and with the evidence on behalf of the People, that the jury was justified in finding defendants guilty.

Complaint is made of the admission of the dying declarations. A dying declaration is a declaration made by a party relating to the facts of the injury of which he afterwards dies, under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance. (*People* v. *Buettner,* 233 Ill. 272; *People* v. *Corder,* 306 id. 264; *People* v. *Selknes,* 309 id. 113; *People* v. *Borella,* 312 id. 34.) The state of mind of the deceased at the time these dying declarations were made is apparent from the evidence. The

evidence comes within the rule above announced, and there was no error in admitting the dying declarations.

Complaint is made of the first, thirteenth and fourteenth instructions on behalf of the People. No question was raised in the trial court as to the first and thirteenth instructions. Defendants filed a written motion for a new trial and a written motion in arrest of judgment, in both of which they complained that the court was in error in giving the fourteenth instruction but no error was assigned as to any other instruction. Under the practice in this State, decisions of the court made in the progress of the trial upon instructions, objections to evidence, or other matters of law arising in the cause which have been incorporated in a bill of exceptions, may be assigned for error and reviewed by an appellate court without any motion for a new trial. They are not waived by making a motion for a new trial if such motion is submitted without any points stated in writing, but after a motion is made for a new trial and the grounds thereof are stated in writing the party is limited to the errors alleged in the written motion and all other errors are deemed to have been waived. (*Chicago City Railway Co.* v. *Smith,* 226 Ill. 178; *Yarber* v. *Chicago and Alton Railway Co.* 235 id. 589; *People* v. *O'Gara,* 271 id. 138; *People* v. *Cione,* 293 id. 321; *People* v. *Perlmutter,* 306 id. 495; *People* v. *Vickers,* 326 id. 290; *People* v. *Gabrys,* 329 id. 101.) Under these authorities defendants were limited to the error assigned in giving the fourteenth instruction.

The fourteenth instruction, among other things, told the jury that the law of self-defense does not imply the right of attack in the first instance, nor does it permit of actions done in retaliation or for revenge. It is not contended that this instruction, taken as an entirety, did not state a correct rule of law, but it is insisted that it should not have been given because there was no evidence on which to base it. This instruction is almost identical, in

the language used, with an instruction approved by this court in *People* v. *Battaglia,* 282 Ill. 91. It was there held that the instruction was good if there was evidence in the record tending to prove that the accused made an attack upon the deceased but not otherwise, as was held in *Filippo* v. *People,* 224 Ill. 212, and *Foglia* v. *People,* 229 id. 286. There was evidence in this record which tended to prove that defendants made an attack upon the deceased, and there was no error in giving this instruction.

We find no reversible error, and the judgment will be affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment affirmed.*