Annette Patargias, Appellee, v. Coca-Cola Bottling Company of Chicago, Inc., Appellant.

Gen. No. 43,991.

118

Opinion filed June 26, 1947. Released for publication July 8, 1947.

ROBERT D. THOMPSON, of Chicago, for appellant; RICHARD E. KEOGH, of Chicago, of counsel.

ROBERT IRMIGER, of Chicago, for appellee; ROBERT E. CUSACK and THOMAS J. WYNN, both of Chicago, of counsel.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This action was brought by plaintiff, Annette Patargias, to recover damages from the defendant, Coca-Cola Bottling Company of Chicago, for an illness alleged to have been suffered by her as the result of drinking Coca-Cola which was manufactured and bottled by the defendant and purchased by her at a confectionery store. The case was tried before the court and a jury and a verdict was returned finding the defendant guilty and assessing plaintiff's damages at $1,000. Judgment was entered on the verdict. Defendant appeals. No question is raised on the pleadings and it is not claimed that the damages awarded plaintiff are excessive.

There is no substantial dispute as to the facts in this case. Defendant sold and delivered bottled Coca-Cola by the case to the Spa Sweet Shop at the corner of 108th street and Michigan avenue, Chicago, Illinois. When delivered, the cases of Coca-Cola were placed in the rear of the store. Behind the soda fountain counter in the front portion of the store there was a cabinet in which bottles of Coca-Cola were cooled preparatory to their sale to customers. Whenever necessary, the attendants at the soda fountain would take bottles of Coca-Cola from the cases in the rear

of the store to replenish the supply in the cooler. On the night of July 24, 1943 plaintiff and her sister went into the Spa Sweet Shop, sat at the counter and each ordered a bottle of Coca-Cola. The waitress took two bottles of Coca-Cola from the cooler, removed the caps therefrom with a bottle opener and placed one bottle in front of plaintiff and one in front of her sister. Plaintiff placed a straw in each bottle and without looking particularly at the contents of her bottle she proceeded to drink same through the straw. According to plaintiff, the following then occurred: "When I got half way down, I remarked to my sister, 'It had an awful taste to it.' She said hers was all right. I kept on drinking, and when I came to the bottom of the bottle, the straw hit something. I picked up the bottle and looked at it, and there was a mouse in it. . . . I let out a scream, and the owner came up and told me to keep quiet, not to attract too much attention on account he had a few customers in the store . . . I got nauseated, and I went on out and threw up." Plaintiff and her sister then went to the home of their mother who lived in the immediate vicinity. Dr. Joseph A. Pape was called and he arrived shortly thereafter. Plaintiff continued to be nauseated and have violent spells of vomiting all that night and the following day. The doctor ordered her to remain in bed for the first few days. Her condition then improved to the extent that she was able to be up and around the house part of the time for the next two weeks. However, during said two weeks and for a considerable period thereafter she was nauseated and vomited at frequent intervals. Dr. Pape treated her about ten times. Inasmuch as the defendant does not claim that the damages awarded plaintiff are excessive, it is unnecessary to set forth the facts as to her illness and damages in any greater detail.

Defendant presented in evidence a number of photographs and a diagram which showed the machines used

by it and how same were operated in cleaning returned bottles and filling them with its product after they were cleaned. The superintendent of defendant's plant testified at length as to the method of washing, cleaning and filling the bottles and as to the manner in which the bottles were inspected by defendant's employees after they were cleaned in the washing machine and before they were filled. Briefly summarized, defendant's evidence disclosed that the machines and equipment used by it for washing, filling and capping the Coca-Cola bottles were installed in 1939; that the entire process is automatic; that when the used, dirty bottles are returned to the plant from the retailers, many of them contain foreign substances; that no attempt is made to remove such foreign substances from the bottles before they enter the washing machine; that the dirty bottles are first placed on a conveyor which carries them to the back of the washer, where employees remove them from such conveyor to the "automatic feed" on the washer; that the bottles proceed, each on a separate carrier, through the washer, which is composed of several compartments, the first four of which contain solutions of warm or hot water and caustic soda at various temperatures; that the fifth compartment contains only fresh water; that hydraulic pressure and air pressure are applied to the inside of each bottle and the bottles are sterilized; that when the bottles are finally discharged from the washer they remain stationary, while one of defendant's employees inspects them at the rate of 264 bottles a minute for breaks or cracks and to see if they contain any foreign substance; that they are then carried on a conveyor to be filled but, before entering the filler and while they are moving, they are inspected by another employee at the same rate of 264 bottles a minute; that the inspectors are off 15 minutes after each 30 minutes they work, because they have "a pretty tedious job"; and that if there is a foreign

substance in one of the bottles after it leaves the washer and defendant's inspectors fail to detect same, that substance would be bottled by the filling machine along with the Coca-Cola.

Plaintiff's complaint predicated her right to recover on two grounds: (1) that the defendant was negligent in bottling the mouse along with the Coca-Cola in the bottle in question, which was delivered to the Spa Sweet Shop and purchased by her; and (2) that the defendant breached its implied warranty that the Coca-Cola purchased by her was fit for human consumption. Defendant's answer denied that it was liable on either of the grounds asserted in plaintiff's complaint.

Defendant first contends that "there is no testimony of any kind connecting the injury claimed with the happening of the accident in question." It is argued in support of this contention that there was no medical testimony which tended to show that plaintiff's illness was proximately caused by the contents of the bottle of Coca-Cola. It is true that when Dr. Pape, plaintiff's attending physician, testified as to her condition on the night of July 24, 1943 and subsequent thereto, he was not asked by her counsel "hypothetically or otherwise, whether or not the drinking of the Coca-Cola might or could have caused the condition which he found." It is also true that defendant's attorney elicited from Dr. Pape on cross-examination the information that he had treated plaintiff occasionally over a period of about two months prior to July 24, 1943 for a mastitis or inflammation of the breast and torticollis or wryneck, and that as a result of a vaginal examination he thought that she might have an ovarian cyst. The ailments for which plaintiff was treated by Dr. Pape prior to July 24, 1943 may be disregarded, since there is no evidence in the record which tends to show that they had any connection with the nausea, vomiting and nervousness from which she

suffered immediately after she drank the Coca-Cola on the night in question and for a considerable period thereafter.

■ While ordinarily it is necessary to resort to medical testimony to prove a causal connection between the occurrence complained of and the alleged injury or illness, such is not the rule where, as here, the causal connection is clearly apparent from the illness itself and the circumstances attending it—the dead mouse in the bottle of Coca-Cola and the consumption by plaintiff of the major portion of the contents of such bottle. It was unnecessary for the jury to speculate or conjecture as to the cause of plaintiff's illness. The facts and circumstances in evidence showed that her illness was directly attributable to the contaminated Coca-Cola which she consumed. In *Duval v. Coca-Cola Bottling Co.*, 329 Ill. App. 290, the plaintiff, an airplane pilot, also drank Coca-Cola from a bottle containing a dead mouse. There the court said at p. 295:

"Defendant contends that there was no testimony which tended to show that plaintiff's sickness was proximately caused by the contents of the bottle of Coca-Cola. It points to the absence of medical testimony and to the likelihood that plaintiff's eating in restaurants and the flight may well have been responsible for his sickness. We think plaintiff's experience was sufficient basis for a finding by the jury that the substance which he drank caused his illness."

■ ■ Defendant next contends that the verdict was against the manifest weight of the evidence on the question of its negligence and plaintiff's freedom from contributory negligence. It asserts that plaintiff's own evidence clearly shows that she was guilty of contributory negligence. The evidence referred to is plaintiff's testimony that "when I got half way down, I remarked to my sister, 'It had an awful taste to it' . . . She said hers was all right . . . I

kept on drinking and when I came to the bottom of the bottle, the straw hit something . . . I picked up the bottle and looked at it, and there was a mouse in it.'' Whether or not plaintiff's conduct as shown by her foregoing testimony constituted contributory negligence was purely a question of. fact for the jury. Even though the Coca-Cola did seem to plaintiff to have ''an awful taste'' after her first drink of it, her sister's assurance that ''hers was all right'' may well have caused her to believe that she might have been mistaken as to her taste in the first instance. In any event, she certainly had the right to assume that the Coca-Cola was not contaminated by a dead mouse in the bottom of the bottle. In our opinion the jury was warranted in finding that plaintiff was not guilty of contributory negligence.

This brings us to the consideration of the evidence bearing on defendant's negligence. Since plaintiff's evidence showed that there was a dead mouse in the bottle of Coca-Cola when she purchased same and that the mouse was in the bottle when it left defendant's plant, she made out a prima facie case that defendant was negligent in bottling the Coca-Cola and it was incumbent upon defendant to negative or overcome such prima facie case. The evidence introduced in defendant's behalf has been heretofore set forth and it is unnecessary to repeat it. Defendant stresses the care used by it in washing and inspecting the bottles and in filling and capping them after they were inspected and insists that in view of all the precautions taken by it, it was highly improbable, if not impossible, that there could have been a mouse in the bottle when it was filled and capped. Nevertheless, the mouse was in the bottle when it left defendant's plant and of course it was impossible for it to get into the bottle while it was sealed with a cap. It is suggested by the defendant that there was an opportunity to tamper with the bottles of Coca-Cola while they were in the cases in the rear portion of the

Spa Sweet Shop and that plaintiff's evidence did not exclude the possibility that the mouse may have entered or been placed in the bottle in question while it was in the back of the store. We do not think that this suggestion is seriously made or intended to be seriously considered, in view of the fact that the bottle of Coca-Cola was sealed with a Coca-Cola cap when it was ordered and taken from the cooler and that said cap was removed by the waitress with a bottle opener when the bottle was served to plaintiff.

While it is true that no particular act of negligence on the part of the defendant was shown by plaintiff, in the very nature of the case that could not be done. However, it may be fairly inferred from the defendant's own evidence that it did not use reasonable care in inspecting the bottles. The mere fact that it was considered necessary to inspect the bottles for the presence of foreign substances therein after they had been finally discharged from the washer is significant in that it indicates that defendant knew of the likelihood or, at least, the possibility of such a substance remaining in a bottle after it had gone through the washer. The fact that defendant's inspectors, whose job was admittedly "tedious," were required to examine the bottles for breaks, cracks and foreign substances, after they were washed, at the rate of 264 bottles a minute is hardly consistent with the exercise of due care on its part. As a matter of common knowledge and experience a reasonably careful inspection for breaks and cracks as well as foreign substances could not have been made by an examination of the bottles at the rate of 264 a minute. The fact that the mouse was in the bottle of Coca-Cola before it left defendant's plant seems to us to be conclusive circumstantial evidence that the washing and cleaning process failed to dislodge it and that the inspectors negligently failed to discover it in the bottle before the latter was filled with Coca-Cola and capped.

The jury was warranted in inferring and finding from all the facts and circumstances in evidence that the defendant negligently filled the bottle in question with Coca-Cola while there was a dead mouse in such bottle.

■ The defendant further contends (1) that "there is no evidence to support a breach of warranty as far as this plaintiff is concerned" and (2) that the trial court erred in giving the following instruction tendered by plaintiff:

"You are instructed that the law imposes on the manufacturer of food or drink in sealed containers an implied warranty to the purchasers thereof that the contents of said containers are fit for human consumption."

Defendant is precluded from urging either of the foregoing contentions on this appeal. As heretofore shown, one of the theories upon which plaintiff based her right to recover was that the defendant had breached its implied warranty that the Coca-Cola purchased by her was fit for human consumption. It is true that the defendant's answer denied that it was liable to plaintiff on an implied warranty. Whether or not there was an implied warranty by the defendant to plaintiff under the facts and circumstances in evidence presented a question of law. Defendant's theory now is that there could not have been an implied warranty because there was no privity of contract between it and plaintiff, she having purchased the bottle of Coca-Cola from the Spa Sweet Shop, a retailer, but it did not advance that theory of defense upon the trial by way of instruction or otherwise.

■ The defendant filed a written motion for a new trial specifying the grounds relied on for the granting of such motion. Having failed to include in such grounds the alleged error of the trial court in giving the aforesaid instruction tendered by plaintiff, the defendant must be deemed to have waived such al-

leged error. This is generally recognized to be the established rule in this state, notwithstanding the extensive argument in the defendant's reply brief to the contrary. In *Rubottom v. Crane Co.*, 302 Ill. App. 58, this court said at p. 65:

"It must be conceded, of course, that the right to appeal is statutory, and any party who wishes to avail himself of that statutory right must conform to the statute, and courts of review will not vary the application or interpretation of the rules to suit the contingencies of the particular case. (*Lewis v. Renfro*, 291 Ill. App. 396.) In conformity with this principle of law the Practice Act requires a written motion for a new trial, specifying the grounds relied on (Ill. Rev. Stat. 1937, ch. 110, sec. 68, par. 192 [Jones Ill. Stats. Ann. 104.068]). It was held in *People v. Hatcher*, 334 Ill. 526, that under the practice in this State decisions of the court made in the progress of the trial upon instructions, objections to evidence, or other matters of law arising in the cause which have been incorporated in a bill of exceptions, may be assigned for error and reviewed by an Appellate Court without any motion for a new trial, and are not waived by making a motion for a new trial if such motion is submitted without any points stated in writing; but 'after a motion is made for a new trial, and the grounds thereof are stated in writing, the party is limited to the errors alleged in the written motion and all other errors are deemed to have been waived. (*Chicago City Railway Co. v. Smith*, 226 Ill. 178; *Yarber v. C. & A. Co.*, 235 Ill. 589; *People v. O'Gara*, 271 Ill. 138; *People v. Cione*, 293 Ill. 321; *People v. Perlmutter*, 306 Ill. 495; *People v. Vickers*, 326 Ill. 290; *People v. Gabrys*, 329 Ill. 101.)' "

■ Even though it be assumed that the defendant did not waive its right to now question the propriety of plaintiff's claim of implied warranty, in our opinion there is no merit in the defendant's contention

that there could have been no implied warranty of the wholesomeness of its product available to plaintiff, because there was no privity of contract between her and it. Plaintiff's position in regard to defendant's instant contention is that the law imposes on manufacturers of food or beverages, which are sold in sealed containers, an implied warranty to the ultimate purchasers thereof that the contents of said containers are wholesome and fit for human consumption.

So far as we have been able to ascertain the precise question as to whether the law imposes on manufacturers of food sold in sealed containers an implied warranty to the ultimate purchasers thereof that such articles of food are fit for human consumption has not heretofore been considered or determined by the Supreme Court of this State. A somewhat similar question was considered by the third division of this court in *Welter v. Bowman Dairy Co.*, 318 Ill. App. 305, where a bottle of milk was purchased by the head of a family directly from the Bowman Dairy Company and it was conceded that an implied warranty as to the wholesomeness of the milk was available to the purchaser thereof. However, it was contended that such implied warranty did not extend to the infant daughter of the purchaser who it was claimed became seriously ill as the result of drinking some of the milk. There the case of *Davis v. Van Camp Packing Co.*, 189 Iowa 775, was cited with approval and, in accordance with the law enunciated in that case, it was held that a manufacturer's implied warranty that its products are fit for human consumption runs with the sale of the article for the benefit of the consumers thereof.

The *Davis* case, which was an action at law to recover damages by reason of the sickness of Alfred Davis alleged to have been caused by the eating of Van Camp's pork and beans, is squarely in point as to both of the grounds relied on by plaintiff for recov-

ery in the instant case—defendant's alleged negligence and its implied warranty. In that case the defendant was engaged in the manufacture of canned goods, including pork and beans, for human consumption. One of its cans of beans was sold by the defendant to a wholesale grocer and he in turn sold it to a retail grocer, from whom it was purchased by Mrs. Davis. Four of her children ate some of the beans shortly after she brought the can home. One of the younger children died subsequently from ptomaine poisoning and the other three children were taken sick soon thereafter. At the close of the evidence there was a directed verdict for the defendant. The Supreme Court of Iowa, in reversing and remanding the case for a new trial, said at p. 785 *et seq.*:

"The contention is that, because of this and all the circumstances, plaintiff made a prima facie case; and that, notwithstanding the defendant's evidence, there was a question for the jury as to whether plaintiff's prima facie case had been negatived or overcome by defendant's evidence. They say, too, that if, under the evidence, defendant's liability is based upon a breach of warranty, express or implied, plaintiff would not be required to show negligence on the part of the defendant in the selection, preparation, and marketing of its product. Numerous cases are cited, holding that, in cases similar to this, the case should go to the jury on both questions of implied warranty and negligence. . . .

"It must be admitted that there is much confusion in the authorities as to the theory of the liability of defendant, if any, in this class of cases. Some of the cases hold that the action is bottomed upon negligence alone; others, that there is an implied warranty; and still others, that there is an implied warranty, and that if, in addition, it is found that the seller was negligent in selling food products that were dangerous to those

who ate them, he would be liable for the consequences if, by proper care, he could have known of the condition. . . .

"From the decisions, and particularly the later decisions, we think there is an implied warranty, as contended by plaintiff, and that the question as to privity is not controlling. The case should have gone to the jury on that question. We are of opinion, too, that, on the whole case, there was sufficient evidence to take the case to the jury on the question of negligence, and that it was for the jury to say whether plaintiff's prima facie case had been negatived or overcome by the testimony introduced on behalf of the defendant. . . .

"We make a distinction between food products which are canned, bottled, or wrapped in such a way that the contents and the condition thereof may not be known to the purchaser until opened for use by the consumer, and products which are not so put up, and the condition of which is observable. . . .

"We are of opinion that the duty of a manufacturer to see to it that food products put out by him are wholesome, and the implied warranty that such products are fit for use, run with the sale, and to the public, for the benefit of the consumer, rather than to the wholesaler or retailer, and that the question of privity of contract in sales is not controlling, and does not apply in such a case. . . .

"The question of caveat emptor has been referred to in some of the cases heretofore cited. In the earlier cases, followed, perhaps, by some of the later ones, when a person went to market, with a market basket on his arm, and could examine the food, the doctrine was held to apply, in the absence of a warranty. But the business of canning food products of almost every kind has increased enormously in recent years. The purchaser has no opportunity of examination, until the can is opened for use; and, under the circum-

stances of this case, we think the doctrine does not apply."

In the *Davis* case the court approved the statement of the Supreme Court of Tennessee in *Boyd v. Coca-Cola Bottling Works,* 132 Tenn. 23, that "upon whatever ground the liability of such a manufacturer to the ultimate consumer is placed, the result is eminently satisfactory, conducive to the public welfare, and one which we approve."

In *Jacob E. Decker & Sons, Inc. v. Capps,* 139 Tex. 609, 164 S. W. (2d) 828, the defendant manufactured and sold sausage which was packaged in a cellophane wrapper. A package of the sausage was purchased from a retailer by C. K. Capps. It was consumed immediately by members of Capps' family and as a result one of his children died and other members of the family were made seriously ill. The reasons stated in that case for the imposition of a warranty on a manufacturer of food products to the ultimate purchaser or the consumer thereof that such products are wholesome are peculiarly applicable to the question of implied warranty presented here. There the Supreme Court of Texas said at pp. 832–833:

"There certainly is justification for indulging a presumption of a warranty that runs with the article in the sale of food products. A party who processes a product and gives it the appearance of being suitable for human consumption, and places it in the channels of commerce, expects some one to consume the food in reliance on its appearance that it is suitable for human consumption. He expects the appearance of suitableness to continue with the product until some one is induced to consume it as food. But a modern manufacturer or vendor does even more than this under modern practices. He not only processes the food and dresses it up so as to make it appear appetizing, but he uses the newspapers, magazines, billboards, and the radio to build up the psychology to

buy and consume his products. The invitation extended by him is not only to the house wife to buy and serve his product, but to the members of the family and guest to eat it. In fact, the manufacturer's interest in the product is not terminated when he has sold it to the wholesaler. He must get it off the wholesaler's shelves before the wholesaler will buy a new supply. The same is not only true of the retailer, but of the house wife, for the house wife will not buy more until the family has consumed that which she has in her pantry. Thus the manufacturer or other vendor intends that this appearance of suitability of the article for human consumption should continue and be effective until some one is induced thereby to consume the goods. It would be but to acknowledge a weakness in the law to say that he could thus create a demand for his products by inducing a belief that they are suitable for human consumption, when, as a matter of fact, they are not, and reap the benefits of the public confidence thus created, and then avoid liability for the injuries caused thereby merely because there was no privity of contract between him and the one whom he induced to consume the food. The mere fact that a manufacturer or other vendor may thus induce the public to consume unwholesome food evidences the soundness of the rule which imposes a warranty, as a matter of public policy on the sale of food or other products intended for human consumption.''

It was also said in the *Decker* case at p. 832:

''Where there is privity of contract and there is a breach of warranty, either expressed or implied, liability can be sustained thereon, as in the case of the sale of commodities other than food. . . . The fact, however, that liability may be sustained in some cases because of a breach of a contractual warranty does not argue against the sustaining of liability on the ground herein adhered to—warranty imposed by

law as a matter of public policy. The two remedies may coexist, and liability may be sustained under either one of them that is available.''

We are impelled to hold that, where an article of food or drink is sold in a sealed container for human consumption, public policy demands that an implied warranty be imposed upon the manufacturer thereof that such article is wholesome and fit for use, that said warranty runs with the sale of the article for the benefit of the consumer thereof and that plaintiff had the right to maintain this action against the defendant on its implied warranty as the manufacturer of the Coca-Cola, which she purchased, that it was wholesome and fit for human consumption.

In our opinion plaintiff had two remedies available to her. She could have proceeded against the immediate vendor, the owner of the Spa Sweet Shop, on his implied warranty that the Coca-Cola which she purchased from him was wholesome or fit for use or she could elect, as she did, to pursue her remedy against the defendant for the breach of its implied warranty that its product, which it has so widely advertised and distributed, was fit for human consumption. It may well be that plaintiff elected to bring this action against the defendant rather than against the owner of the Spa Sweet Shop, because she considered that the latter would be unable to satisfy any judgment that she might recover against him.

For the reasons stated herein the judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

FRIEND, P. J., and SCANLAN, J., concur.