**BLOMMER CHOCOLATE COMPANY, Employers Insurance of Wausau and Old Republic Insurance Company, Plaintiffs,**

v.

**BONGARDS CREAMERIES, INC., and J.M. Swank Company, Inc., Defendants.**

**J.M. SWANK COMPANY, INC., Third party plaintiff,**

v.

**PACEMAKER, LTD., Third party defendant.**

**No. 83 C 0536.**

United States District Court, N.D. Illinois, E.D.

June 28, 1985.

Scott W. Hansen, Reinhart, Boerner *et al.*, Milwaukee, Wis., Thomas W. Murphy, Haskell & Perrin, Chicago, Ill., for plaintiff.

Deborah L. LaDolce, Law Offices of Roderick J. Bergin, Chicago, Ill., for defendant/cross-claimant/third party plaintiff.

James T. Martin, Gislason and Martin, Edina, Minn., William E. Spizzirri, Chicago, Ill., for third party defendant and defendant/cross-defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

### INTRODUCTION

This case stems from the salmonella contamination of several hundred thousand pounds of plaintiff's chocolate products in early 1982. When ingested by humans salmonella bacteria can cause salmonellosis, commonly known as food poisoning. Salmonellosis on occasion can be fatal.

Plaintiff, Blommer Chocolate Company,[1] as its name suggests, is a manufacturer of chocolate products. Its suit is directed against Bongards Creameries, Inc., which manufactured the dry whey powder, a milk product,[2] that allegedly was the source of

---

1. Plaintiffs Employers Insurance of Wausau and Old Republic Insurance Company are subrogees of Blommer, having paid part of Blommer's losses.

2. In one of its briefs Bongards describes dry whey as follows:

Whey is a fluid which is obtained by separating the coagulum from milk, cream, and/or skim milk in the process of making cheese. Dry whey or dried whey is a dry substance which is obtained by removing water from whey while leaving all the constitu-

the contamination, and J.M. Swank Company, Inc., from which Blommer ordered the whey. Counts I–III of the complaint allege that defendants breached express warranties, implied warranties of merchantability, and implied warranties of fitness for a particular purpose, respectively. In Counts IV and V Blommer alleges that Bongards negligently misrepresented the quality of the whey powder and was guilty of common law negligence. Count VI alleges that the defendants were negligent *per se* because in selling contaminated whey powder they violated Illinois pure food laws, Ill.Rev. Stat. ch. 56½ ¶¶ 215.01 and 503.1. Count VII alleges that defendants are strictly liable in tort.

Blommer's suit has spawned a third party complaint by Swank against Pacemaker, Ltd. Swank ordered the whey from Pacemaker on Blommer's behalf. Pacemaker in turn arranged to have Bongards prepare the whey for Swank, for delivery to Blommer.[3] Swank has also filed a cross-claim against Bongards. Before the court are Blommer's motion for partial summary judgment against Swank, Bongards' motions to dismiss Blommer's complaint and Swank's cross-claim, and Pacemaker's motion to dismiss Swank's third party complaint.

### FACTS

Linda Wolin, Blommer's purchasing agent, was responsible for purchasing the dry whey powder used by Blommer as an ingredient in its chocolate coatings. During 1980 and 1981 Blommer regularly purchased whey from Swank, a food broker. According to Wolin, in ordering from Swank she stressed that the whey powder supplied Blommer had to be free of salmonella. There is apparently no safe level of salmonella contamination in products destined for human consumption.

In the summer of 1981, Wolin contacted Randy Hill, a Swank employee with whom she had had regular dealings, to arrange a large order of dry whey powder. According to Wolin, Hill recommended Bongards as a supplier of whey powder and assured Wolin that the Bongards whey would meet Blommer's quality standards. The August 11, 1982 purchase order associated with their discussion specified that the whey would be "extra grade," "guaranteed salmonella negative," and "tested salmonella negative before shipment to Blommer." The order also stated that "salmonella statements are to accompany invoices or be written on the invoices."

It is clear from the record that "extra grade" whey denotes whey of the highest quality that is salmonella-free and fit for human consumption. Joseph Blommer, who is in charge of Blommer's Chicago facility, testified to this effect. Larry Pacha, Swank's president, recognized this fact, as did two Bongards officials, Raymond Henchen and Jack Budhan. Neither defendant has submitted any evidence that "extra grade" whey was not understood in the trade as being free of salmonella.

Having accepted Blommer's order, Swank contracted with Pacemaker for the requisite amount of extra grade whey. Pacemaker in turn arranged by phone with Bongards for the preparation of the whey. According to Jack Budhan, who has been Bongards' general manager since 1938, most of Bongards' customers are food processing and manufacturing concerns. Bongards, however, had no direct dealing with either Swank or Blommer, at least not before the whey was ready for delivery. Further, Bongards had no specific knowledge that the whey prepared for Pacemaker was destined for use by Blommer in manufacturing chocolate coatings.

Three of the four invoices covering Bongards' sale of whey to Pacemaker describes the whey as being of "extra grade." Blommer received deliveries of the whey on January 13, 1982, February 2, 1982, February

---

ents in the same relative proportions as in the whey.

**3.** Although there is some indication to the contrary, Swank claims that it rather than Pacemaker actually picked up the whey from Bongards and delivered it to Blommer.

10, 1982, and February 19, 1982. The deliveries were promptly followed by invoices from Swank. These invoices stated that the whey delivered was "guaranteed Salmonella Penicillin free and conforms to all other U.S.D.A. and F.D.A. specifications where it [sic] applies." The whey was packaged in heavy-duty plastic-lined bags labeled "extra grade," that had been sealed at Bongards and remained sealed until opened at Blommer.

According to Damien Gabis, executive vice-president of Silliker Laboratories, Inc., which acts as a consultant to Blommer on matters pertaining to the detection and control of salmonella, there are two sources of salmonella contamination at a food manufacturing plant like Blommer's. First, salmonella may occur in the raw ingredients; second, salmonella may exist in the processing environment and infiltrate the food products during their preparation.

Between 1967 and early 1982, Silliker had performed several thousand tests of Blommer's raw ingredients, processing environment and finished products. Prior to the contamination at issue here, Silliker never found salmonella in either a finished product or in the processing environment. Well before 1982 Silliker did find salmonella in one dry milk sample. Salmonella also was occasionally found in the dust of raw cocoa beans. Salmonella in cocoa beans is not unexpected and Blommer isolated the beans before roasting them at a temperature high enough to kill the salmonella bacteria.

Silliker regularly tested the whey received by Blommer. Its test of the whey received by Blommer on January 13, 1982 revealed no salmonella contamination. Blommer used all of the January 13, 1982 shipment to manufacture chocolate coatings between February 5, 1982 and February 15, 1982. Silliker also tested the February 2, 1982 shipment soon after it was received and found no salmonella. Blommer used a portion of this shipment before mid-February.

On or about February 13, 1982, Silliker found salmonella in several finished product samples from Blommer. Almost simultaneously one of Blommer's customers found salmonella in a recently delivered shipment of Blommer's chocolate compound. Further tests of Blommer's finished products determined that only those products which contained Bongards' whey were contaminated. As a result of the contamination, Blommer was forced to recall its chocolate coatings, decontaminate its processing facilities and assist several of its customers who were forced to decontaminate their facilities.

There are approximately 1500 strains of salmonella bacteria. The distinctiveness of the various strains assist in tracking down the source of the salmonella contamination. The strain found in Blommer's chocolate compound is known as cubana.

Suspecting that the Bongards whey was the source of the contamination, Silliker tested what remained of the whey in the February 2, 1982 shipment. This re-test found that the shipment was contaminated with salmonella cubana. All of the January 13, 1982 shipment had by this point been used up, so no test on this whey was possible. Silliker then notified the Chicago office of the Food and Drug Administration [FDA] of this data. The FDA dispatched investigators to Bongards. These investigators found salmonella cubana in tailings taken from the dry whey sifter collection barrel. The FDA also dispatched investigators to Blommer. After examining the Blommer processing facilities they permitted production to continue, presumably convinced that the source of contamination was neither the processing environment nor other raw materials.

Bongards was not unacquainted with the problem of salmonella contamination. During an inspection of Bongards from January 11, 1982 through January 14, 1982 inspectors from the U.S. Department of Agriculture [USDA] found salmonella in dry whey powder that had been produced on January 10, 1982. Tests of whey powder produced on January 16, 1982 revealed salmonella. Bongards' testing records also revealed occasional instances of salmonella

contamination. None of these tests included the serological typing, which would have revealed whether the salmonella was of the cubana strain. Other USDA tests performed before and after January and February 1982 uncovered salmonella contamination at Bongards.

## DISCUSSION

### 1. Blommer's Motion for Partial Summary Judgment against Swank

In its April 11, 1984 Memorandum and Order, this court dismissed Counts VI and VII as to Swank. The counts were based, respectively, on negligence *per se*, because of a violation of Illinois statutes against the sale of adulterated milk and food products, Ill.Rev.Stat. ch. 56½, ¶¶ 215.01 [4] and 503.1, and on strict tort liability. Blommer's motion for summary judgment is based on Counts I–III of the complaint, which are breach of warranty claims.

Swank does not contest the applicability of contract law to the dispute. Blommer's purchase order, after all, did call for extra grade whey that was free from salmonella. Invoices that Swank issued to Blommer stated that it had supplied extra grade whey that was guaranteed salmonella-free. Swank's president testified that extra grade whey was by definition fit for human consumption and free of salmonella. The real dispute is whether Blommer has shown with a sufficient degree of certainty that the Bongards whey supplied by Swank was the source of the contamination.

As summarized above, the record shows that only those Blommer products that were made with Bongards' whey were contaminated. Tests show that the February 2, 1982 shipment of Bongards' whey was contaminated. In late February 1982 the FDA found that Bongards' whey-processing facilities were contaminated. The USDA found salmonella contamination at Bongards twice in mid-January 1982 and at other times both before and after the Blom-

mer incident. Bongards' own records show occasional contamination of the whey it produced during early 1982. In contrast, while the USDA has noted some sanitary deficiencies at Blommer, records reveal no instances of salmonella contamination of Blommer's processing environment or finished product, and only one instance of raw material contamination, outside of cocoa beans, prior to this occurrence.

These facts alone point strongly towards summary judgment. Because the samples taken from the Blommer chocolate, Bongards' February 2, 1982 shipment of whey and Bongards' whey-processing facility, were all subjected to serological testing, the evidence becomes compelling. These samples all revealed that the salmonella was of the cubana strain. Given this commonality, the existence of 1500 strains of salmonella, the well-accepted use of serological testing to track down the source of contamination, the likelihood that Bongards' whey contaminated Blommer's food products is extremely strong.

After extensive discovery Swank has still failed to do more than make minor dents in the armor of Blommer's case. It has not explained why only the products using Bongards' whey became contaminated. It does not dispute that salmonella cubana was found in the February 2, 1982 shipment and in Bongards' processing facility. It has not rebutted the presumption of the culpability that springs quite naturally from finding the same strain of salmonella in the Bongards' whey, in only those products using Bongards' whey, and in the Bongards processing facility.

Swank makes a valiant effort to avoid summary judgment, based primarily on the fact that the tests performed on the whey before its use by Blommer did not reveal salmonella contamination. However, even if Blommer's failure to discover before use that the whey was contaminated reveals the inadequacy of test procedures, this would not help Swank. First, Swank does not contest the accuracy of the later posi-

---

**4.** Section 215.01 has been repealed and replaced with the Grade A Pasteurized Milk & Milk Prod-

ucts Act, Ill.Rev.Stat. ch. 56½, ¶ 2201 *et seq.*

tive findings of salmonella cubana contamination in the Bongards' whey, in only the products using Bongards' whey, and in Blommer's plant. Nor has Swank undercut the validity of the USDA inspections that found contamination of Bongards' processing facilities and of Bongards' own records that showed occasional product contamination.

Second, Swank's suggestion that the inadequacy of test procedures may mean that salmonella contamination of Blommer's raw materials or its processing environment was never uncovered and that this contamination caused the contamination of the chocolate products, is the sort of speculation that cannot defeat a well-supported motion for summary judgment. Swank has yet to advance any hard evidence that Bongards' whey was not the source of the contamination. Swank has advanced nothing to suggest that the inconsistent results of the early Blommer tests stem from poor testing methods rather than from the nature of the contamination or some other factor.

While summary judgment is to be granted with caution, it is appropriate here. Swank, of course, does not bear the burden of proving that Bongards' whey was not the source of the contamination. Faced with the well-supported theory that Bongards was the source of the contamination, however, Swank has failed to even hint at the outlines of an exculpatory theory for which there is some evidentiary support. Although the conclusion that the salmonella originated at Bongards rests upon inferences from undisputed facts it is no less compelling.

### 2. Bongards' Motion for Summary Judgment on all Counts of Blommer's Complaint

Bongards mounts a two-pronged attack on Blommer's complaint. It argues that the breach of warranty claim, Counts I–III, fail for lack of privity and the tort claims, Counts IV–VII, fail because Blommer's losses were only economic and not recoverable in tort. Because Blommer has not moved for summary judgment against Bongards, the issue in effect is whether under the existing record it is impossible as a matter of law for Blommer to recover either tort or contract damages against Bongards.

In its previous memorandum and order this court held that recovery in tort is not barred by *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). *Moorman* rejected use of a theory of strict liability in tort for recovery of solely economic losses. *Id.* 61 Ill.Dec. at 751, 435 N.E.2d at 448. The *Moorman* court also held that "when a product is sold in a defective condition that is unreasonably dangerous to the user or consumer or to his property, strict liability in tort is applicable to physical injury to plaintiff's property, as well as the personal injury." *Id.*

Relying upon *ABCO Metals Corp. v. J.W. Imports Co., Inc.*, 560 F.Supp. 125 (N.D.Ill.1982), *aff'd on other grounds* 721 F.2d 583 (7th Cir.1983), this court held that at least part of Blommer's loss may have stemmed from a "sudden and calamitous occurrence" caused by contaminated whey. Nothing since our memorandum and order has indicated that this holding was incorrect. In fact, in *Vaughn v. General Motors Corp.*, 102 Ill.2d 431, 80 Ill.Dec. 743, 466 N.E.2d 195 (1984), the Illinois Supreme Court embraced an expansive view of what damages are compensable in a strict liability action. The plaintiff in *Vaughn*, uninjured himself, sued the manufacturer of a truck whose brakes were defective. He sought compensation for the loss of the truck, expenses incurred in renting another truck, extra time expended at work, costs of cleaning up the load of spilled fuel, expenditures for repairs of the brakes prior to the occurrence and the cost of repairing the bulk fuel tank being carried. *Id.* 80 Ill.Dec. at 743, 466 N.E.2d at 195. The *Vaughn* court permitted recovery under *Moorman* because these losses stemmed from the sudden and calamitous occurrence caused by the brake defect. *Id.* 80 Ill.Dec. at 745, 466 N.E.2d at 197.

As noted in this court's previous opinion, the contamination of Blommer chocolate and of its processing facilities might be

analogized to a sudden and calamitous occurrence caused by a defective product. *Moorman* and *Vaughn* pose no legal bar to Blommer's maintenance of a tort action against Bongards. Bongards has yet to mount challenges to the specific tort claims.

■ Count VI, however, must be dismissed for a different reason. That count alleges that Bongards was negligent *per se*, having violated state pure food laws, Ill.Rev.Stat. ch. 56½, ¶¶ 215.01 and 503.1. As this court noted in its earlier opinion, violation of a statute designed for the protection of human life or property does not constitute negligence *per se* but is only prima facie evidence of negligence which may be rebutted by proof that the party acted reasonably under the circumstances, despite the violation. *Davis v. Marathon Oil Co.*, 64 Ill.2d 380, 1 Ill.Dec. 93, 97, 356 N.E.2d 93, 97 (1976).

■ Bongards argues that it should be granted summary judgment on Count I because it made no express warranties to Blommer as to the condition of the whey. It has introduced evidence that the so-called salmonella statements that Blommer has used as a basis for the express warranty claim were in fact prepared after the contamination was discovered. Bongards, however, did expressly warrant, in invoices issued to Pacemaker, that its whey was "extra grade." Because it appears that "extra grade" whey was understood to be free of salmonella, it cannot be concluded that Bongards made no express warranties as to the condition of the whey.

■ The breach of warranty action is the appropriate way for Blommer to recover purely economic losses. Bongards argues that the breach of warranty claims fail because there was no privity of contract between Blommer and Bongards. Generally a plaintiff must have been in privity of contract with the defendant in order to bring a breach of warranty action. Historically, as the economic relationships became more complex the privity requirement increasingly permitted manufacturers to escape liability to individuals harmed by their defective products. The tort theory of strict liability developed in part in response to limitations imposed by the privity requirement in breach of warranty actions. *Moorman*, 80 Ill.Dec. at 748, 435 N.E.2d at 445. *See generally* Prosser, *Assault Upon the Citadel*, 69 Yale L.J. 1099 (1960).

Even before the Illinois Supreme Court embraced the doctrine of strict tort liability in *Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182 (1965), Illinois courts had done away with the privity requirement in breach of warranty actions involving victuals. *See Sharpe v. Danville Coca-Cola Bottling Co.*, 9 Ill.App.2d 175, 132 N.E.2d 442 (3d Dist.1956); *Patargias v. Coca-Cola Bottling Co.*, 332 Ill.App. 117, 74 N.E.2d 162 (1st Dist.1947); *Welter v. Bowman Dairy Co.*, 318 Ill.App. 305, 47 N.E.2d 739 (1st Dist.1943).

Bongards argues that the privity requirement is waived with respect only to ultimate consumers of the product. This approach, however, does not appear to be followed in Illinois, *see Southland Milling Co. v. Vege Fat, Inc.*, 248 F.Supp. 482 (E.D.Ill.1965) (applying Illinois law) or elsewhere, *see Randy Knitwear, Inc. v. American Cyanamid Co.*, 11 N.Y.2d 5, 226 N.Y. S.2d 363, 181 N.E.2d 399 (1962). In *Southland*, for example, the vegetable fat supplied by defendant injured plaintiff's chickens and not consumers of the chickens, and the court nevertheless permitted recovery. Here, the allegedly contaminated whey made chocolate destined for human consumption unfit.

Consequently, Blommer is not barred as a matter of law from recovering its damages from Bongards in tort, or its purely economic losses under a breach of warranty theory. At this point the court need not consider objections to specific warranty and tort claims, especially because Bongards has advanced none.

**3. Bongards' Motion for Judgment on all Counts of Swank's Cross-Claim**

■ In Counts I–III of the cross-claim Swank seeks indemnity on the basis of express and implied warranties purportedly made by Bongards. Count IV attempts to state a claim for indemnity as recognized

by the Illinois Supreme Court in *Maxfield v. Simmons,* 96 Ill.2d 81, 70 Ill.Dec. 236, 449 N.E.2d 110 (1983). Count V seeks contribution pursuant to Ill.Rev.Stat. ch. 70, ¶ 301 *et seq.,* Counts VI–VIII of the cross-claim seeks damages stemming from Blommer's refusal to pay for the February 2, February 9 and February 16, 1982 shipments of whey because they were allegedly contaminated by salmonella. These latter counts rest upon the theory that Bongards breached express and implied warranties.

As noted in the previous section, the cross-claims for indemnity based upon a breach of express warranty do not fail for lack of an express representation, nor do the claims for indemnity based upon a breach of warranty fail for lack of privity. Count IV of the cross-claim draws vitality from *Maxfield,* where the Illinois Supreme Court permitted a home builder to maintain a third party complaint for indemnity and contribution from the manufacturer of roof trusses. Given that Blommer is legally entitled to proceed in tort against the two defendants, Swank is permitted to preserve a claim in Count V under the Illinois Contribution Statute, Ill.Rev.Stat. ch. 70, ¶ 301 *et seq.*

### 4. Pacemaker's Motion to Dismiss Swank's Third Party Complaint

Swank's third party complaint against Pacemaker is identical to its cross-claims against Bongards. Pacemaker raises several creative but unavailing arguments in its motion to dismiss the third party complaint in its entirety.

■ First, notice to the seller of a breach of warranty is a substantive requirement of a later breach of warranty action. Ill. Rev.Stat. ch. 26, § 2–607(3)(a); *see Klockner, Inc. v. Federal Wire Mill Corp.,* 663 F.2d 1370, 1378 (7th Cir.1981); *see also Goldstein v. G.D. Searle & Co.,* 62 Ill. App.3d 344, 19 Ill.Dec. 208, 378 N.E.2d 1083 (1st Dist.1978). The aggrieved buyer need only give timely notice to the immediate seller, *Goldstein,* 19 Ill.Dec. at 211, 378 N.E.2d at 1086. Swank has not alleged that it gave any notice to Pacemaker prior to filing its third party complaint, sixteen months after discovery of the contamination. Dismissal of the breach of warranty claims is inappropriate at this point. The issue of timeliness is "ordinarily a question of fact which is determined by looking to all the circumstances of the case." *Goldstein,* 19 Ill.Dec. at 213, 378 N.E.2d at 1088. Given Pacemaker's relatively minor role, and its failure to allege any prejudice from lack of prompt notice, factual development will be necessary to resolve the timeliness issue. *See e.g., Goldstein* (complaint filed four years after occurrence not untimely as a matter of law).

■ Second, Pacemaker's argument that Swank has failed to make out a cause of action for breach of implied warranty of fitness for a particular purpose, because Swank has not alleged that Pacemaker knew the purpose for which the whey was to be used, is specious. The complaint alleges that Swank sought extra grade whey—whey fit for human consumption— and that Pacemaker warranted that it supplied such whey. A fair inference is that the particular purpose for which the whey was purchased was its use in foodstuffs destined for human consumption.

Third, given the well-recognized danger posed by salmonella contamination of food products, Swank has adequately alleged in Count IV that contaminated whey represented an unreasonably dangerous product. In any event, Count IV is not based solely on strict liability but appears instead to seek both indemnity and contribution for a wide variety of contract and tort claims pursuant to *Maxfield v. Simmons.*

■ Fourth, fairly read, the Count V claim for contribution under Ill.Rev.Stat. ch. 70, ¶ 301 *et seq.,* makes out a claim. The questions of whether Swank actually relied upon Pacemaker's allegedly negligent misrepresentations and whether Pacemaker as a foodbroker can fairly be said to be a supplier of information, are ones of fact properly left for summary judgment or trial. Interestingly, Pacemaker's motion to strike as redundant the alleged misrepresentations set out in Counts V(a) and V(b), appears to concede that extra grade whey was understood to be whey free of salmonella. In any event, the statements

are different enough to survive a motion to strike at this stage.

Fifth, given that Swank has stated claims in Counts I through V, Pacemaker's motion to dismiss Counts VI, VII and VIII because they are improperly impleaded pursuant to Rule 14(a) of the Federal Rules of Civil Procedure, must be denied. Having properly impleaded Pacemaker as third party defendant in Counts I–IV, Rule 18 of the Federal Rules of Civil Procedure permit Swank to bring in all of its claims against Pacemaker in this lawsuit.

### Conclusion

Blommer's motion for partial summary judgment against Swank is granted. Bongards' motion for summary judgment is granted as to Count VI of the complaint and denied otherwise. Bongards' motion for judgment on all counts of Swank's cross-claim is denied. Pacemaker's motion to dismiss Swank's third party complaint is denied.