**DENISON MINES, LIMITED, Plaintiff-Appellee,**

v.

**MICHIGAN CHEMICAL CORPORATION, Defendant-Appellant.**

No. 71–1312.

United States Court of Appeals,
Seventh Circuit.

Argued April 20, 1972.

Decided Nov. 1, 1972.

Rehearing Denied Dec. 20, 1972.

Miles G. Seeley, George V. Bobrinskoy, Jr., Ronald W. Szwajkowski, Chicago, Ill., for defendant-appellant.

Michael I. Miller, Richard E. Powell, Chicago, Ill., for plaintiff-appellee.

Before PELL and STEVENS, Circuit Judges, and JUERGENS,* Senior District Judge.

STEVENS, Circuit Judge.

By written contract dated August 22, 1966, defendant agreed to buy from plaintiff 480,000 pounds of yttrium oxide at a price of $8.50 per pound in a three year period. After accepting and paying the contract price for thirteen shipments containing 90,410 pounds of the material, on October 20, 1967, defendant cancelled the contract. Plaintiff rejected the cancellation notice and tendered another shipment of material; without inspection or analysis of the tendered product, defendant refused to accept that shipment. Plaintiff brought suit for breach of contract and, after a ten-day trial to the court, recovered a judgment for $1,955,364 plus interest and costs.

Defendant-appellant contends that plaintiff should not have recovered any damages because: (1) it delivered nonconforming material; (2) its performance of the contract was tainted with fraud; (3) its post-cancellation tender was untimely; and (4) the contract is the product of an antitrust violation. Finally, defendant urges that the damage award is excessive and that it should have recovered on its antitrust counterclaim.

I.

As a by-product of its uranium mining operations at Elliot Lake, Ontario, plaintiff produces a substance known as "barren liquor," which contains various components including yttrium oxide. Defendant, in 1966, was refining yttrium oxide at its plant in Michigan and selling the refined product to manufac-

---

* Senior District Judge William G. Juergens of the Eastern District of Illinois is sitting by designation.

turers of color television tubes. The contract price which defendant paid plaintiff for the raw oxide was $8.50 per pound; after refining, defendant resold at prices up to $55 per pound. During 1967, because of technological changes in the television industry, the demand for the refined product evaporated. From May until September 1967 defendant unsuccessfully sought to persuade plaintiff to modify the contract. Plaintiff's adamant position ultimately precipitated the termination notice in October.

The contract specifications provided that the raw product should contain at least 8 percent yttrium oxide by weight, and no more than $\frac{1}{10}$ of 1 percent uranium or $\frac{25}{100}$ of 1 percent of thorium. Each shipment did contain adequate quantities of yttrium oxide, but at least the initial shipments contain excess quantities of uranium and thorium.[1]

Thus there was not an exact, literal compliance by the plaintiff with the terms of its contract. Defendant therefore contends that any recovery is barred as a matter of Ontario law, which law is applicable by reason of an express provision in the contract.

The district court found that the record did not establish how many shipments failed to meet either the thorium or the uranium specifications. He also found that the parties knew the early

shipments did not fully comply, but that defendant then had an urgent need for material, and after the fifth shipment the thorium problem was under control. Defendant never rejected or even threatened to reject any shipment because of excess thorium or uranium; had there been such a rejection, plaintiff could have substituted conforming material. Nor did defendant seek any price adjustment, or contend that the material actually shipped was less valuable than it should have been.[2] The findings as a whole, which are well supported by the evidence, make it plain that neither the parties to the contract at the time of its performance, nor the district court at the time of trial, regarded the departure from specifications as a material breach of contract. Nevertheless, defendant argues that Ontario law requires "exact, literal compliance."

 We may assume that any deviation from the contract specification that was not merely "de minimis" would justify a purchaser's rejection of a particular shipment, Runnymede Iron & Steel, Ltd. v. Rossen Eng'r. & Constr. Co., 30 D.L.R.2d 410, 417 (S.Ct.Can. 1961); that a seller's *material* breach would justify a buyer's repudiation of an entire agreement, Robert A. Munro & Co. v. Meyer, [1930] 2 K.B. 312 (Commercial Ct.); California Prune & Apricot Growers, Inc. v. Baird & Peters, [1926] 1 D.L.R. 314, 318 (S.Ct.Can.

1. The district court found:

"Denison constructed its original yttrium circuit as rapidly as possible and made some early shipments which did not fully meet specifications because Michigan urged it to do so to help Michigan meet its then urgent need for the material.

"No later than February, 1967, Denison decided to install Podbielniak extractors at a cost of $300,000.00 (Canadian Funds) to produce yttrium-bearing material and so informed Michigan on a number of occasions. A purchase order for these extractors was issued by Denison in March, 1967, installation began in July and they were in operation in early October, 1967. Michigan was informed when the Pods were ordered

and when they were in operation. Michigan was informed that the Pods would result in a product which always was well below the uranium and thorium specifications. In fact, the Pod-produced material always has had yttrium values substantially in excess of the minimum percentage specified in the contract, which makes it more valuable than the original product, and has had uranium and thorium values well below contractual specifications." Findings 31 and 32, A. 116–117.

2. Apparently the value of excess yttrium in the raw material more than offset the diminution in value caused by the excess impurities. See note 1, *supra*.

1925) ;[3] and that a buyer's acceptance of some defective installments would not obligate him to accept additional defective deliveries, 2 Williston, Sales § 467d at 778 (Rev.Ed.1948) ; but none of those propositions supports defendant's position in this case. Defendant has not called our attention to any case holding that a breach of contract which is not sufficiently serious to be classified as "material" with respect to the entire bargain may justify an anticipatory repudiation of the unaffected portion of an installment contract.[4] As we understand the relevant Ontario law, the buyer's right to cancel the contract is dependent on the materiality of the seller's breach. Since defendant failed to convince the district court that plaintiff had committed a material breach of contract, and since we agree with the district court's appraisal of the facts, defendant's principal justification for cancellation is not sufficient as a matter of Ontario law.

## II.

■ Defendant contends that plaintiff intentionally falsified certain uranium and thorium assays in connection with deliveries made in June of 1967. The contrary finding by the district court is described as "clearly erroneous." Rather than discussing the factual basis for the contention, we assume for purposes of decision that false reports were made and consider their legal effect. As already indicated, it is the law of Ontario that controls.

Defendant relies on Greenberg v. Lake Simcoe Ice Supply Co., 39 Ont.L.R. 32 (1917), in which the court relied on two of the opinions in Panama & South Pacific Telegraph Co. v. India Rubber, Gutta Percha, and Telegraph Works Co., L.R. 10 Ch. 515, 520, 525 (1875). In Greenberg a coal dealer refused to sell to a customer who had bribed a clerk in charge of the dealer's scales to issue false weight-tickets to him. The court held that the dealer's price quotation to the plaintiff had not created a contract,[5] and then added the additional point that the surreptitious dealing between the plaintiff and an agent of defendant would have given defendant a right to rescind in any event.

The Panama case also involved a surreptitious transaction between one party and the agent of the other. The plaintiff Telegraph Company, relying on the advice of an engineer named Bright, entered into a contract with the defendant for the laying of a submarine cable; Bright was to certify the progress and would be paid a percentage of each installment paid to the defendant contractor. Unbeknownst to plaintiff, Bright entered into a subcontract with defendant to do the actual work in laying the cable. After discovering that transaction, plaintiff filed a bill in equity to rescind its contract and to recover its progress payment. Plaintiff prevailed, the Vice Chancellor and the two justices of the Court of Chancery Appeals relying on two related but somewhat different grounds.

---

3. At page 318 the court stated : "The law is now well settled that in mercantile contracts the time and place of shipment are material or essential parts of the description of the goods sold and full compliance therewith is a condition precedent to the seller's right to recover." Of course, whether the deviation from concededly "material" terms is itself material depends on the language of the contract and the facts and circumstances of the case.

4. If as a matter of fact the district court had determined that the pattern of nonconformity established a probability of significant repetition in the future, he could, of course, have concluded that a material

breach had been committed. Robert A. Munro & Co. v. Meyer, [1930] 2 K.B. 312 (Commercial Ct.) ; Maple Flock Co. v. Universal Furniture Products (Wembley), Ltd., [1934] 1 K.B. 148 (Ct.App. 1933). The district court's appraisal of this case was, however, quite the opposite. See Findings 32 and 33, A. 117. And, of course, defendant even though it accepted the installment, could always have sued for damages arising from a failure of the installment to meet specifications.

5. "The letter is no more than what it purports to be—a mere quotation of price." 39 Ont.L.R. at 33.

First, the likelihood that Bright had an expectation of entering into the subcontract with the defendant was sufficient to taint the execution of the contract.[6] Second, the justices were of the opinion that the fraud, even if subsequent to the making of the contract, deprived the plaintiff of the full benefit of its bargain and justified rescission. Some of the language used by Lord Justice James broadly suggests that any fraudulent conduct in the performance of a contract would give the other party the right to terminate.[7] It is this language which this defendant relies upon as stating the relevant Ontario law.

We believe, however, that the language must be taken in the context of the facts before the court and also in the light of other decisions adopting a more traditional approach to the law of fraud. In the *Panama* case the fraud was material and the Telegraph Company had relied on the supposedly independent advice of the engineer presumably to its substantial detriment. In the case before us, there is no evidence that defendant placed any reliance whatsoever on plaintiff's thorium and uranium assays; defendant made its own analy-

ses of the material, apparently before the plaintiff's assays were even received.

The *Greenberg* case is the only Ontario case which has been called to our attention as relying on Lord Justice James' 1875 opinion; *Greenberg* was also a case in which the fraud was material and clearly would have injured the coal dealer whose weighmaster had been corrupted. Other Canadian cases plainly state that reliance is an essential element of a fraud defense. Thus, in George v. Dominick Corp. of Canada, the Supreme Court of British Columbia stated:

"No misrepresentation, however gross or fraudulent, draws with it any civil consequences unless it was material and was intended to, and did, influence the mind of the representee so as to affect his conduct. Inducement in fact and materiality (a tendency to induce) are wholly distinct and separate matters, and that in any form of proceedings, it is necessary to establish both the one and the other.

"Actual inducement must be shown, irrespective of materiality. In other words, however antecedently probable it may have been in any case that the

---

6. "I think it is sufficient to support that case if they make out that on the 12th of January, 1870, when the contract between the two companies was made, Sir Charles Bright had a reasonable expectation, founded upon the acts of the Defendants, that he would obtain a profitable sub-contract for the laying of the cable, and that the Defendants had notice that he had that expectation. It is quite obvious that if at the time when the contract was made Sir Charles Bright had the expectation that he would get a favorable contract for laying the cable, although he might not be certain that he would get it, it was quite impossible that he could be a proper person to advise the Plaintiffs as to the proper form of their contract with the Defendants, particularly with reference to the actual laying of the cable. It is not necessary to determine whether the scientific men who say that there ought to be particular provisions respecting the laying of the cable, which are not in

this contract, are right or not. It is quite sufficient that the laying of the cable was a material part of the contract, with reference to which the Defendants must have known that the Plaintiffs required honest and disinterested advice." L.R. 10 Ch. at 528.

7. "I am of opinion that where anything in the nature of a fraud in the eye of this Court is committed, a man has the right at once to sever the connection; and I cannot bring my mind to doubt, that if you find a case where, in the contemplation of this Court, a principal is conspiring with the servant of the other principal to cheat his master in the execution of a contract, then in common sense, common justice, common honesty, and in this Court, the master is entitled to say, 'I will have nothing more to do with the business;' and in this Court a surreptitious sub-contract with the agent is regarded as a bribe to him for violating or neglecting his duty." *Id.* at 527.

misrepresentation alleged would influence a normal person to take just the steps which he did, yet, if in fact he was not so influenced, he has no cause of action. 8 D.L.R.3d 631, 638 (B.C. Sup.Ct.1969)."

See also the House of Lords decision in United Shoe Machinery Co. of Canada v. Brunet [1909], A.C. 330, 338.

Although we find no Ontario decision directly in point, we are not persuaded that the courts of that Province would accept a fraud defense in a case in which there is no evidence that the defendant was actually deceived or injured, or had placed any reliance on the conduct in question. We conclude that the district court properly rejected the fraud justification.

### III.

Defendant next argues that if its repudiation of the contract on October 20, 1967, was wrongful, plaintiff then had an option either to sue for damages for that breach, or to reject the repudiation and treat the contract as remaining in full force and effect.[8] On November 2, 1967, plaintiff rejected the cancellation notice and therefore made the latter election. The consequence of this election, according to defendant, is that it "is entitled to take advantage of all supervening events constituting non-performance thereafter by the party attempting to uphold the contract." [9]

Defendant argues that after plaintiff's election on November 2, 1967, "it failed to tender the performance on its part required by the contract. There is thus in the Record not the slightest evidence of performance by Denison or of breach by Michigan." [10]

This is not an accurate description of the evidence which is relevant to the issue raised by defendant's election argument.

After November 2, 1967, plaintiff tendered performance by actually making a shipment of conforming material on December 20, 1967. Defendant rejected that shipment without inspection, merely referring to its earlier unequivocal repudiation of the contract in October.[11] If the contract remained in full force and effect after November 2, 1967, as defendant argues, it was certainly repudiated again on December 20. Since we have concluded that the October repudiation was wrongful, the precise issue is whether the "supervening events" between November 2 and December 20 gave defendant the right to repudiate the revived contract on the latter date. The specific supervening event disclosed by the record is plaintiff's failure to make a shipment in November.

The Canadian authorities on which defendant places its principal reliance do not answer this precise question even though they do recognize the election rule. In Dalrymple v. Scott, 19 Ont. App. 477 (1892), it was the seller who repudiated and the plaintiff-buyer who, by failing to sue immediately, was held to have elected to treat the contract as surviving. He alleged that he thereafter made a demand for delivery, but failed to prove any such demand. In this case there is no doubt that plaintiff made a post-election tender; our problem is to determine the consequences of the fact that the tender was made in December instead of November.

In McBride v. Johnson, 31 D.L.R.2d 763 (S.Ct.Can.1962), the promisor's

---

8. See Dalrymple v. Scott, 19 Ont.App. 477 (1892) ; McBride v. Johnson, 31 D.L.R. 2d 763, 769–70 (S.Ct. Can.1962) ; and Thomas Garage, Ltd. v. Prozanowski, [1931] 2 D.L.R. 179, 182 (S.Ct. Alberta). See also Kentucky Natural Gas Corp. v. Indiana Gas & Chemical Corp., 129 F.2d 17, 20 (7th Cir. 1942), cert. denied, 317 U.S. 678, 63 S.Ct. 161, 87 L.Ed. 544.

9. Appellant's Brief p. 26.

10. *Ibid.*

11. The October letter of repudiation had concluded: "Therefore, we respectfully request that Denison refrain from shipping any more of it to us and advise you that we cannot accept it if it should be shipped." DX 13.

death was the supervening event which frustrated performance after the promisee elected to treat the contract as continuing in effect. Similarly, in Australian Dispatch Line v. Anglo-Canadian Shipping Co., [1940] 4 D.L.R. 104 (Ct. App.B.C.), the rechartering of the vessel made it impossible for plaintiff to perform after he made his election. Thus, in each of those cases the "supervening event" demonstrated that the contract could not be performed and foreclosed plaintiff's claim.

In this case, however, the "supervening event" did not impair plaintiff's ability to perform the contract, and did not deprive defendant of any of its benefits. The tender on December 20 evidenced plaintiff's continuing ability and willingness to perform and gave defendant an unequivocal opportunity to revise its earlier decision to repudiate the contract. It is perfectly clear from the record that a November tender would have been no more acceptable to defendant than the one made in December. We are therefore persuaded that the December tender met the requirements of the election rule as stated in the Canadian cases.[12]

■ Defendant argues, however, that Canadian law requires strict compliance with contract provisions specifying the time of shipment and, therefore, in effect that *any* late delivery of any installment is a material breach justifying termination of the entire contract. We find no Canadian case laying down such a strict rule; we find no language in this contract justifying any such strict approach;[13] and we are persuaded that in this "post-election" situation the materiality of plaintiff's late delivery should be judged in the context which obtained at that time rather than when the contract was executed. In that perspective, defendant's argument is plainly untenable.

■ Indeed, notwithstanding the argument that termination may be justified by the slightest failure to meet a precise deadline for the next delivery, we are not quite sure of the date when defendant contends the first post-election shipment was due. The logic of defendant's argument would indicate that since no October shipment had been made, it was already too late on November 2 for strict compliance with the monthly delivery requirement, and therefore the election simultaneously revived the contract and provided defendant with the right to treat it as a nullity. An argument, even if logical, which would lead us to such a result must be rejected. We hold that the December tender was adequate to preserve plaintiff's right to sue for breach of contract.

■ Under our analysis of the election issue, however, we do not believe plaintiff's damage recovery should have included an amount which was, in effect, attributable to October and November shipments which were neither made nor tendered. If plaintiff had not rejected the October 18, 1967, cancellation letter on November 2, 1967, it would have been entitled to recover damages for all further shipments. It seems quite clear, however, that the omission of the November shipment was a "supervening event" which should inure to defendant's benefit; we also believe that the November 2 election should be construed as

---

12. An excerpt from the opinion of Osler, J. A., in Dalrymple v. Scott, which in turn is a quotation from an earlier English case, identifies the consequences of the election:

"He remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstances which would justify him in declining to complete it." 19 Ont.App. 477, 488.

13. Although the contract provided for monthly deliveries, it contains no language suggesting that the entire contract should be considered breached if a late delivery should be made, or even if a delivery should be missed. The contract did not even set a specific date for the first shipment.

a waiver of any claim founded on the anticipatory rejection of the October delivery. We recognize that the right to make up shortages when deliveries are delayed by "force majeure" might support the entire recovery allowed by the district court, but we are persuaded that a proper application of the election rule forecloses the recovery of damages on account of shipments neither made nor tendered in October and November of 1967.

The exact amount of the reduction in the amount of damages is a matter for determination by the district court in the first instance, since there were variations in the size of deliveries and the precise issue has not been argued.

### IV.

Defendant asserted both an affirmative defense and a treble damage counter-claim under the antitrust laws. The essentials of the transactions on which these two antitrust contentions are predicated are: (1) that plaintiff's purchase of 268,100 shares of International Mining Corportion stock between April 25 and June 3, 1966, violated Section 7 of the Clayton Act and Section 2 of the Sherman Act and rendered the contract dated August 22, 1966, unenforceable; and (2) that the contract price of $8.50 per pound was predicated on a recommendation made by an executive of defendant's principal competitor, with whom plaintiff's president met on June 22 or June 23, 1966, in consequence of its purchase of International Mining Corporation stock. We consider the two transactions—or as defendant contends, the two phases of the same transaction—separately.

1. The district court found that defendant had failed to offer any evidence "to establish a relevant product market within which [defendant's] antitrust allegations can be evaluated", [14] and, further, that plaintiff had "purchased the International stock solely as an investment." [15] Accordingly, he found no violation of the antitrust laws.

We are not prepared to say that either of these findings is clearly erroneous, but there is sufficient strength to defendant's evidence to cause us to make a further analysis of the issue. Since the relevant facts are complex, we shall only state our conclusions.

Defendant argues, in essence, that plaintiff exercised its illegally acquired monopoly power to impose oppressive contract terms upon the defendant. Our analysis of the record persuades us, however, that the dramatic imbalance between the available supply and the burgeoning demand for raw yttrium oxide in 1966 was completely unrelated to the acquisition of which defendant complains. Even if we assume with the defendant that the Yttrium Corporation of America was the product of an illegal joint venture, that the Rio Algom output was preempted unlawfully, and that Davidson Chemical had been persuaded improperly to stop shipments to plaintiff prior to May 6, 1966, those events all took place prior to the challenged purchases of International Mining Corpora-

---

14. "There was no probative evidence offered by Michigan to establish the amounts of yttrium raw material available at Elliott Lake or the amounts owned by Denison, Rio Algom or others. Nor was any probative evidence offered to establish that Elliot Lake was the only source available to Michigan in 1966. Indeed, there was no evidence whatsoever offered to establish a relevant product market within which Michigan's antitrust allegations can be evaluated. The record does show, however, that there were many other sources of yttrium raw material and that a number of Michigan's competitors obtained raw material from sources other than Elliot Lake." Finding 40, A. 119.

15. "The record establishes that Denison purchased the International stock solely as an investment and that Michigan was so informed at the time of the purchase. There is no indication that Molycorp's or YCA's rare earth activities were considered by Denison when it purchased the International shares. When purchased, International shares were undervalued, selling for less than their book value." Finding 43, A. 120.

tion stock between April 25 and June 3, 1966.[16] There is no evidence that the shortage of raw yttrium oxide was in any way attributable to those acquisitions of International Mining Corporation stock. Thus, the acquisitions gave plaintiff no economic power of bargaining strength beyond that which it already possessed.

██ It follows that even if the acquisition of International Mining Corporation stock was unlawful, that illegality would not make plaintiff's contract with defendant unenforceable. See Bruce's Juices, Inc. v. American Can Company, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219, and cases cited at 755, 67 S.Ct. 1015.

██ 2. The counterclaim raises a somewhat different question. Even if the contract is enforceable, defendant could nevertheless recover on its counterclaim if the $8.50 price had been set illegally. The sequence of events on which defendant relies is that: (a) plaintiff was originally willing to sell for $6 per pound; (b) as a result of plaintiff's acquisition of IMC stock, Paul Kruesi, an executive of an affiliate of IMC which was also a competitor of defendant in the selling of refined yttrium oxide, met with plaintiff's president to discuss matters of common interest; (c) at that meeting while discussing a French company's proposal to purchase raw material from plaintiff for a price of $3 per pound, Kruesi stated that he was "shocked" by that proposal and recommended that plaintiff not sell for less than $9 or $10 per pound; and (d) after receiving that recommendation plaintiff made a "take it or leave it" proposal to defendant at the $8.50 price which defendant was compelled to accept.

The district court found that the $8.50 price was not set by agreement with Kruesi but instead that plaintiff determined that price independently based on its appraisal of what defendant was willing to pay. Kruesi's recommendation that the French company should be charged at least $9 or $10 may have been one of the factors considered—and indeed may have been given special consideration—but that fact would not require the court to find that plaintiff's determination was the product of an agreement with Kruesi.[17] It was also well within the range which would be suggested by other market information which became available to plaintiff during the contract negotiations.[18] The evidence on which defendant relied to establish a causal connection between plaintiff's acquisition of an interest in IMC and its agreement with defendant on contract terms was not strong enough to require us to conclude that the dis-

16. We recognize the possibility that something relevant might have happened between April 25, 1966, and May 6, 1966, but, having given defendant the benefit of assuming that its offer of proof was improperly rejected by an unduly narrow interpretation of the hearsay rule, we are not willing to construe the somewhat vague reference to the Davidson matter in its offer of proof any more broadly.

17. The $8.00 price was very close to the price which would have been paid pursuant to a formula approach to pricing which had been proposed by the defendant. The district court found: "At the June 21 meeting, the parties discussed the possibility of Denison receiving 25% of the profit which Michigan would make on selling refined yttrium oxide. And, at the outset of the June 27 meeting, Michigan offered to pay Denison $6.65 per pound, plus or minus 25 cents per pound for each $1.00 increase or decrease from $44.00 per pound of Michigan's price for refined product. Michigan had informed Denison that its refined products sold in the range of $45.00–$55.00 per pound. At this price level for the refined product, it appears that a raw material price substantially in excess of $6.65 would result under the formula proposed by Michigan." Finding 47, A. 121.

18. The court found: "Michigan had previously disclosed to Denison the prices it was paying to other suppliers for raw material, which had been as high as $22.00 per pound on a spot basis. Denison had also obtained market information during its unsuccessful negotiation with Pechiney St. Gobain, a French refiner of yttrium oxide and from other industry sources." Finding 48, A. 121.

trict court's findings on this issue were clearly erroneous.

### V.

Defendant also contends that the damage award was excessive for reasons independent of those discussed in Part III, *supra.*

After entering into the contract with defendant, plaintiff entered into another contract to sell lesser quantities to Yttrium Corporation at a price of $9.00 per pound. Defendant correctly points out that plaintiff's uranium operations in 1968 and 1969 did not produce enough by-product to enable it to fulfill both contracts; the damage computation assumed ability to perform in full, hence, it is argued, it was excessive.

Plaintiff's response is that it had previously accumulated about 1 million tons of barren liquor in a pond constructed in 1965, and that supply was clearly adequate to provide the amount of yttrium oxide needed to perform both contracts.

Defendant's rejoinder is that the evidence respecting this reserve supply is a complete fabrication conceived on the eve of trial, and, in any event, plaintiff should be estopped from relying on the reserve supply theory because it successfully objected to pretrial discovery which would have disclosed the existence of the reserve pond.

On the basis of the showing made by defendant in support of its rather general request for an order permitting inspection of the area, we are satisfied that the trial judge's ruling denying the request was well within the scope of his discretion. Nor can we find the basis for an estoppel in defendant's objection to a request that amounted to little more than a suggestion that something relevant might be discovered by roaming at large through plaintiff's vast Canadian properties. If there had been an objection or refusal to respond to a particularized request aimed at determining whether or not alternate sources of supply were in existence, the case would be entirely different.

Finally, we cannot accept the suggestion that the district court should have disbelieved all of the evidence relating to the reserve pond. The testimony was not inherently incredible; the barren liquor was known to contain several rare earths of potential value; it would seem only prudent to store it for possible future use or sale. We are not inclined to make a fresh appraisal of the credibility of witnesses whom the trial judge saw and heard.

Defendant had a fair trial. Unfortunately it made a bargain in 1966 which, for reasons not then foreseeable, turned out to be a bad one.

The judgment as to amount of damages is reversed and the case is remanded for recomputation of damages in accordance with this opinion; in all other respects the judgment is affirmed. Each party shall bear its own costs on this appeal.