**KLOCKNER, INC., Plaintiff-Appellee,**

v.

**FEDERAL WIRE MILL CORP., Defendant-Appellant.**

No. 80–2532.

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1981.

Decided Nov. 12, 1981.

---

Michael H. Greenberg, Graudbard, Moskovitz, McGoldrick, Dannett & Horowitz, New York City, for plaintiff and counterdefendant-appellee.

C. Lee Cook, Jr., Chadwell, Kayser, Ruggles, McGee & Hastings, Ltd., Chicago, Ill., for defendant and counterplaintiff-appellant.

Before PELL, Circuit Judge, MARKEY, Chief Judge,* and WOOD, Circuit Judge.

PELL, Circuit Judge.

This appeal arises from a judgment entered in favor of the plaintiff-appellee Klockner, Inc. (Klockner) following a three-day bench trial of Klockner's diversity claim that Federal Wire Mill Corporation (Federal), anticipatorily breached a contract for the purchase of 1,800 tons of wire rods. The district court entered damages in favor of Klockner in the amount of $658,306.40. The court also denied Federal's counterclaim, which sought damages for a breach of warranty.

Federal raises a number of issues on this appeal. First, it contends the court erred as a matter of fact and law in finding that the 1,000 tons of 6.35 millimeter (mm) wire rods delivered on October 10, 1974, were not sold by sample. Second, Federal contends the failure of the rods to conform to the sample, and other defects of the rod, constituted a breach of express and implied warranties, and entitled Federal as a matter of law to rescind the contract. It was therefore error to deny Federal's defenses and counterclaim based on the breach of warranties. Third, Federal contends the trial court made numerous clearly erroneous findings of fact. Specifically, it assigns as error the following findings: that the parties entered a separate additional oral contract for the sale of Japanese-manufactured 5.5 mm rods; that the testimony of Dr. Blanche Schafroth, Federal's Executive Vice-President and chief operating officer, was incredible while independent testimony of other witnesses which corroborated her testimony was credible; that the subject of a November 7, 1974, meeting between the parties was not the defects of the October

* Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, is sitting by designation.

10 shipment of 6.35 mm wire rods; that the October 10 rods were not defective; and that Federal never notified Klockner of its claim that the October 10 rods were defective. Finally, Federal contends that even if the court did not err in finding for Klockner on its complaint, the damages awarded were excessive.

## I. The Trial Court's Findings of Fact.

### A. *The Court's Affirmative Findings.*

The trial court made the following findings of fact. The plaintiff Klockner is a New York corporation engaged in the purchase and sale, through import and export, of steel mill products. The defendant Federal is a Nevada corporation engaged in the manufacture of steel wire and wire products, with its principal place of business in Herrin, Illinois.

In July 1974, Schafroth ordered 1,800 tons of 6.35 mm diameter wire rods from the plaintiff Klockner, in a telephone conversation with Rolf Mainz, Klockner's Chicago district manager. Federal confirmed the order by written purchase order, number 5836, dated July 10, 1974. Klockner confirmed the order on July 12, by its written acknowledgment number 4655.

The rods were to be rolled in Germany in the fourth quarter of 1974 and delivered some six weeks thereafter at a price of $23.75 per hundredweight. By letters of August 1 and 2, 1974, the parties confirmed their oral agreement to amend p.o. 5836 to consist of 1,080 tons of 6.35 mm rods, and 720 tons of 5.5 mm rods. On July 31 Klockner delivered a sample of 6.35 mm rods, "as per our order . . . 4655," and it ran smoothly through Federal's wire drawing machinery. Federal then paid for the sample.

On October 1, 1974, Mainz sent Schafroth a letter confirming that Federal would receive 1800 tons under p.o. 5836. Klockner again wrote to Federal on October 16, 1974, with reference to p.o. 5836 but Federal did not respond.

In October and November of 1974 the price of wire rod dropped precipitously, and during October Schafroth called Mainz and attempted to cancel p.o. 5836. Mainz replied that delivery had already begun, with the rods already on the ocean, and that a valid contract was in effect.

On November 7, 1974, Mainz and Wolfgang Sander, Vice-President of Klockner, met with Schafroth at the Federal plant. The trial court noted that the evidence at trial was conflicting as to what was discussed at the meeting, but concluded that Klockner's testimony provided "the only possible credible version of what took place." Klockner's testimony established that both a prior order of 7 mm wire rod, p.o. 5835, and p.o. 5836 were discussed at this meeting. As to p.o. 5836, the Klockner representatives indicated that they had begun delivery and that Schafroth could not now cancel the contract. Mainz and Sander indicated to Schafroth that if Federal would not accept p.o. 5836, Klockner's only recourse would be a lawsuit. Schafroth replied, "Then sue me." Klockner attempted to contact Federal by certified mail in January and February 1975, "in an attempt to give Federal 'one further opportunity to fulfill (its) contractual obligation.'" Both letters were refused by Federal, and Klockner eventually resold the steel to various companies at the then prevailing, substantially lower, market price of $11.00 per hundredweight.

### B. *Federal's Version.*

After finding the above facts, the trial court turned to and expressly repudiated the version of the facts upon which Federal's defenses and counterclaim were based. Federal's version of the facts required that p.o. 5836 be placed in the context of a series of orders Federal placed with Klockner in July and August of 1974.

The first of these orders was Federal p.o. 5826, issued on July 3, 1974, which sought 3,000 tons of 6.35 mm wire rods, delivery as soon as possible. However, when it became apparent that production schedules would not permit the immediate shipment of the entire order, Federal issued three new purchase orders to replace p.o. 5826. These were:

(1) p.o. 5835 for 500 tons of 7.0 mm rods delivered as soon as possible (Klockner acknowledgment no. 4526);

(2) p.o. 5826 (amended) for 1,000 tons of 6.35 mm rods delivered before the close of navigation on the St. Lawrence Seaway (Klockner acknowledgment no. 4653); and

(3) p.o. 5836 for 1,800 tons of 6.35 mm rods delivered from fourth quarter rolling 1974 (Klockner acknowledgment no. 4655).

The 500 tons of 7.00 mm rods under p.o. 5835 were delivered in the middle of July 1974, but assertedly did not work on Federal's drawing machines. Federal notified Klockner of the problem, and while continuing its efforts to use the rods, paid for them on July 25, 1974. In September Klockner issued a credit memo for the rejected 7.0 mm rods, which were then sold to another customer. This transaction is not at issue in this litigation, and has relevance only as establishing the past practices of the parties.

The parties entered another transaction on July 12, 1974, when Mainz called Schafroth and told her he had found 1,000 tons of Japanese-manufactured 5.5 mm rods available for immediate delivery. Schafroth asked that a sample be shipped, and when it proved satisfactory, requested in early August 1974 that the rest of the rods be shipped. Klockner then issued an acknowledgment, no. 4692, confirming placement of the order, "as per trial lot," and shipped the rods. The acknowledgment referenced Federal p.o. 3448, although Federal had issued no written purchase order, and its purchase order 3448 had actually been issued some years earlier to another manufacturer in a completely unrelated transaction. Federal logged the Japanese-manufactured 5.5 mm rods into its internal records under p.o. 5826 (amended), which had specified German 6.35 mm rods from the September 1974 rolling. Federal did not notify Klockner that it considered the Japanese rods to have been shipped under p.o. 5826 (amended). Federal paid for the rods with the credit memo issued in connection with the 7.0 mm rods in September 1974.

As noted above, at the end of July, 1974, Federal received a sample of 6.35 mm wire, followed in November by delivery of 1,000 tons of such wire. Federal contends that this latter delivery was pursuant to p.o. 5836, and that the wire rods were defective, did not conform to the sample shipped in July, and were rejected by Federal in the meeting of Federal and Klockner personnel on November 7, 1974. Federal's basis for considering the October shipment part of p.o. 5836 is its contention that the July shipment of Japanese rods was not pursuant to any separate oral agreement, but rather was a substitute shipment for 5826 (amended). Thus the 1,000 tons of wire delivered in October were not delivered pursuant to 5826 (amended), as Klockner claims, for that order had already been filled. Rather, they were shipped pursuant to p.o. 5836, the only remaining unshipped contract with Klockner. Federal further contends that the November 7, 1974 meeting centered on the defects of the October shipment of 6.35 mm rods.

Five days after the November 7, 1974, meeting, Federal issued a check for the invoice amount of the October 1,000 ton shipment. Federal contends its payment was for p.o. 5836, and that payment was made solely to take advantage of a prompt payment discount, and in the belief that Klockner would provide credit for the rods, as it had done in the prior instance with the 7.0 mm rods. The typed voucher accompanying the check indicated that it was in payment of p.o. 5826. The copy of the voucher retained by Federal for its records was altered by the handwritten superimposition of the numeral 3 over the typed numeral 2. Federal contends this correction to its internal records, which does not appear on the copy which was mailed to Klockner attached to the check, demonstrates that the rods were indeed received pursuant to p.o. 5836, and thus that the claimed breach of warranty defense and counterclaim relate to that contract. Schafroth conceded that Klockner had never been notified of the correction of the voucher.

Federal also submitted evidence that it was damaged by the breach of warranty, in that it was required to purchase wire rods to replace the defective 1,000 tons, and further that it was forced to dispose of the defective rods at a substantial loss.

The trial court's findings on Federal's version of the facts specifically rejected the notion that the Japanese-manufactured 5.5 mm rods were a substitute for the German-manufactured rods under p.o. 5826 (amended), and found rather that the Japanese-manufactured rods were the subject of an entirely separate oral contract. It found therefore that the October 10th 6.35 mm rods were delivered and paid for under p.o. 5826 (amended). The court based those findings on "documents and the testimony of credible witnesses." The court rejected Schafroth's version of the facts as "too much to believe," and found the testimony of Schafroth herself, "incredible."

The court further found that the October 10 shipment was in conformity with the specifications of p.o. 5826, and that there was no justification for refusing to accept delivery of or to pay for the rods. The rods under p.o. 5826 were not delivered pursuant to a sale by sample, because no sample was delivered under p.o. 5826. Although a sample was sent under p.o. 5836 (the Klockner invoice specifically referenced its acknowledgment 4655, which acknowledged p.o. 5836), because there was no delivery on that order due to Federal's anticipatory breach, any failure to conform to that sample was not a valid defense.

Finally, the court concluded that no notice was given of any alleged defect in the rods delivered on October 10, 1974, pursuant to p.o. 5826 (amended), subsequent to Federal's payment in full on November 12, 1974, until Federal entered its counterclaim in its answer to Klockner's complaint in the instant litigation.

## II. The Standard of Review.

As a preliminary matter, we note that our review of a trial court's findings of fact is limited to the well-established "clearly erroneous" test of Fed.R.Civ.P. 52(a). Such findings will not be set aside unless the reviewing court, after reviewing the evidence, is left with the definite and firm conviction that a mistake has been committed. *Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960); *see Indiana State Employees Association v. Negley*, 501 F.2d 1239, 1241–42 (7th Cir. 1974). When such findings turn heavily upon issues of credibility, the trial court's ability to view the witnesses' demeanor and assess their credibility heightens the reluctance of the appellate court to substitute its judgment on the cold record for that of the trier of fact, and the burden of establishing error is commensurately increased. *Negley*, 501 F.2d at 1242.

The clearly erroneous test is also employed in reviewing documentary evidence, *Luksus v. United Pacific Insurance Co.*, 452 F.2d 207 (7th Cir. 1971),[1] and in evaluating the factual element of mixed questions of law and fact. *Negley*, 501 F.2d at 1241–42. With this standard in mind, then, we turn to Federal's assignments of error.

## III. The Manifest Weight of the Evidence on the Question of Anticipatory Breach.

Federal's contention that the court erred in finding that Federal anticipatorily breached its contract with Klockner is primarily based upon claims that the court's findings were against the manifest weight of the evidence. We first turn our attention to the court's findings that the parties

1. This court has on occasion indicated that a less exacting application of the clearly erroneous standard of review might be appropriate in a "paper case," where the evidence presented to the trial court is primarily documentary. *See, e. g., City of Mishawaka v. American Electric Power Co.*, 616 F.2d 976, 979–80 (7th Cir. 1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981). The case at bar, although involving substantial documentary evidence, turns heavily upon the trial court's credibility assessments of the live testimony, and thus is not an appropriate instance for such heightened review. *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255 at 263 & n.8 (7th Cir. 1981).

entered a separate oral contract for the Japanese-manufactured 5.5 mm rods, and that Schafroth's testimony was incredible despite other testimony which seemed to corroborate her testimony.

### A. The Japanese-Manufactured Rods.

Federal contends the court erred in finding a separate oral contract for the sale of the 5.5 mm Japanese-manufactured rods because such a finding is without support in the record. The trial court judge based his finding both upon the documentation of the transaction, and on his assessment of Schafroth's credibility.

Federal's first contention is that no purchase order numbered 3448, which was the purchase order Klockner acknowledgment 4692 assigned to the Japanese-manufactured rods, was ever issued by Federal to Klockner, and that its number 3448 had been issued in connection with an order of paper products shipped and paid for some years prior. Further, it points out that Mainz and Sander conceded that Klockner never received a written p.o. from Federal for the Japanese-manufactured rods, and contend that the court's finding that p.o. 3448 was the basis of a separate oral contract was based in large part on a chart entered into evidence by Klockner which summarized Klockner's view of the transactions between the parties.[2]

Federal further contends that the court then compounded its error by characterizing as unbelievable Schafroth's version of what was at best a misunderstanding between the parties. It contends Schafroth's testimony on this transaction was not inherently incredible, but rather reflects Federal's understanding and intent in entering the transaction. Finally, Federal contends that Klockner's acknowledgment no. 4692 was an insufficient writing to take the transaction out of the Statute of Frauds, and thus

that the court's finding that Federal's Statute of Frauds defense could not stand was erroneous.

■ We may dispose of this final objection expeditiously. The Illinois Statute of Frauds is satisfied when "a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents." Ill.Rev.Stat. ch. 26, § 2–201(2). Unlike the offer in *R. S. Bennett & Co. v. Economy Mechanical Industries, Inc.*, 606 F.2d 182, 186 (7th Cir. 1979), relied upon by Federal, Klockner acknowledgment no. 4692 clearly evidences that the parties have already "made a deal," and would in itself suffice to bind Klockner if enforcement were sought against it. It was therefore sufficient to satisfy the requirements of the Statute of Frauds. *See Automotive Spares Corp. v. Archer Bearings Co.*, 382 F.Supp. 513 (N.D.Ill.1974).

■ We also find support for the court's interpretation of the documentary evidence. As the court noted, although Schafroth testified that Federal kept meticulous records of its transactions, orders 3448 and 5826 were very dissimilar, and there is no indication in the Federal records of how 3448 became 5826. We are not persuaded by the fact that Federal p.o. 3448 had been issued for a prior purchase in light of the fact that the original contract was made by telephone. The p.o. number assigned to the contract by Klockner is essentially irrelevant. What is crucial is that the documentary evidence surrounding the transaction establishes that the parties entered an oral agreement, later confirmed by written acknowledgment, for rods of a different size from p.o. 5826 (amended), from a different country of origin, to be shipped at a different date, and specifying a different price. Finally, the court noted, the payment which

2. We cannot agree with Federal's contention that this chart, Defendant's Exhibit 36–A, was not supported by the evidence. The chart was a summary of documents, each of which had been entered into evidence independently and was itself admitted into evidence under Fed.R. Evid. 1006 as an aid to the court. Federal's only objection at trial to the admission of the chart was that p.o. no. 3448, which appeared on the chart, was not received from Federal, but "was somehow arrived at by Klockner and subsequently used throughout this transaction."

Federal issued for the Japanese-manufactured rods matched perfectly with the invoices for the three separate shipments of that steel, all of which were issued under and explicitly referenced p.o. 3448. We cannot find error in the court's conclusion that this documentary evidence established that the parties entered into a completely separate transaction for the Japanese-manufactured rods.

Finally, and of considerable significance, the court relied upon its assessment of the testimony of Schafroth as to the disputed transaction. The court noted, "After sitting through three days of trial, this Court concludes that the story woven by Dr. Schafroth was in a word, incredible." We are not persuaded to the contrary by the assertions of Federal's brief, which go primarily to Schafroth's intentions and understanding concerning the Japanese-manufactured steel. We note again that our standard of review is not whether the testimony is inherently implausible, as Federal suggests, but rather is whether the trial court's interpretation of the testimony is clearly erroneous. After reviewing Schafroth's explanation of the documentation of the transaction we are left with the feeling that the version credited by the trial court is fully supported by the documents themselves, and more believable than the Federal explanation. We therefore find no error in the court's conclusion that the Japanese-manufactured rods were the subject of a separate oral contract, and not a substitute for p.o. 5826 (amended), and therefore that the October 10 rods were delivered pursuant to p.o. 5826 (amended).

### B. The Credibility of Schafroth's Testimony.

The primary ground upon which Federal attacks the trial court's findings based on Schafroth's credibility is that its ruling that her testimony was incredible conflicts with its finding that witnesses who corroborated her story were credible. As noted above, the trial court's ruling on Schafroth's credibility in relation to the order of Japanese-manufactured rods was fully supported by the documentary evidence. No independent testimony corroborated Federal's claim. As to Federal's breach of warranty defenses and counterclaim, the issue of Schafroth's credibility in that respect is treated in part IV, below.

We turn, then, to the two major pieces of evidence the court relied upon in assessing Schafroth's credibility: (1) the "internal correction" of Federal's voucher for the October 10th 6.35 mm rods from 5826 to 5836; and (2) Federal's payment of over $504,000 for the allegedly defective rods. Both of these factors, we think, should also be viewed in the light of the incentive that the drop in steel price provided for Federal to desire to get out of its contract.

In determining that the October 10th shipment of 6.35 mm rods was made pursuant to 5826 (amended), the trial court noted the appearance of p.o. number 5826 on the voucher accompanying Federal's payment. The court placed "particular emphasis" on a comparison of the copy of that voucher sent to Klockner and that retained by Federal, which had been altered, as noted above, to read 5836. In rejecting Schafroth's testimony that this was merely an internal correction, the judge noted that Schafroth admitted that no attempt had been made to inform Klockner that the check was mistakenly recorded. In light of this fact, and the other documentary evidence regarding the Japanese-manufactured rod transaction, we believe the court was justified in finding Schafroth's version of the facts incredible.

The court also found it "beyond belief" that Federal would make payment of more than a half million dollars five days after claiming to have told the shippers of the product that it was entirely unworkable. Federal contends that this finding ignores the past practices of the parties as exemplified by the manner in which the parties had earlier dealt with the 7.0 mm rods. The parties' course of dealing with the 7.0 mm rods was not, however, comparable to this latter situation. The 7.0 mm rods arrived at Federal in mid-July, and were paid for on July 25. Federal notified Mainz of the

defect during the third week of July; Mainz suggested that they continue to try the rods and let him know further, which Federal did. Thus Federal was still attempting to use the 7.0 mm rods when they made payment for them. This differs radically from the situation in November involving the 6.35 mm rods. Schafroth's testimony was that Federal had utterly repudiated the rods at the November 7 meeting, and sought to cancel the order at that time. There was no question of attempting to continue trying to use the rods, as there had been in the previous situation. We do not find erroneous the trial court's view that payment is not consistent with this scenario, but is rather more consistent with a situation in which no defect or notice of defect existed.

■ We must, therefore, reject Federal's contention that the trial court erred in its assessment of Schafroth's credibility. On the contrary, we are persuaded that the trial court's reconstruction of the confusing facts underlying this suit is the most plausible one that could be drawn from the documents and testimony. We conclude therefore that the trial court did not err in holding that Federal's refusal of p.o. 5836 was an anticipatory breach of the contract formed between the parties for the sale of 6.35 mm wire rods. We turn our attention next to Federal's defenses and counterclaim based on allegations of breach of express and implied warranties.

IV. Federal's Breach of Warranty Defenses and Counterclaim.

■ Federal contends that the 6.35 mm rods delivered on October 10, 1974, failed to conform to the express warranty made by delivery of a sample, and to implied warranties of fitness for a particular use. If such breach of warranties did in fact occur, Federal contends that not only would Klockner's recovery on its claim be foreclosed, but Federal would be entitled to recover on its counterclaim. Because the buyer's failure to notify a seller of a breach of warranty within a reasonable time bars any remedy against the seller, we turn first to the question whether the trial court erred in ruling that Federal had failed to give such notice, and that recovery was therefore barred.

Section 2–607(3)(a) of the Uniform Commercial Code, Ill.Rev.Stat. ch. 26, § 2–607(3)(a), requires that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." The trial court held that Federal's breach of warranty defenses and counterclaim were barred under this section, relying on *Canada Maple Exchange, Ltd. v. Scudder Syrup Co.,* 223 Ill.App. 165 (1921).

*Canada Maple Exchange* presented facts very similar to those of the instant case. The seller of a carload of sugar sued for the balance of the purchase price, and the buyer counterclaimed for breach of warranty. The Illinois Appellate Court affirmed the dismissal of the buyer's counterclaim, noting that no evidence in the record showed that any notice was given of the alleged breach of warranty until the counterclaim was filed to the seller's suit for the price, more than one year after the delivery of the sugar. 223 Ill.App. at 168. Although *Canada Maple Exchange* was decided prior to Illinois' adoption of the UCC, under § 49 of the Uniform Sales Act, the Illinois Code Comment to § 2–607(3)(a) notes that the section "continues the rule of USA § 49," and cites *Canada Maple Exchange* with approval. Ill.Ann.Stat. ch. 26, § 2–607(3)(a) (Smith-Hurd). The trial court found similarly here that Federal's silence on the putative defects of the wire rods until it filed its counterclaim in this suit, some eight months after delivery, barred recovery under 2–607(3)(a).

Federal asserts the trial court erred in so holding in two respects: first, that such a holding is inconsistent with the findings of the court's order that during October Schafroth called Mainz and attempted to cancel p.o. 5836, and again, that Schafroth telephoned Mainz and told him that she did not want delivery of the 1,800 tons of wire rods; second, that the manifest weight of the evidence demonstrates that Federal person-

nel had cancelled the contract. Specifically, Federal cites in support of its contention that the holding is clearly erroneous: Sander's testimony that the reason he went to Herrin in November was the cancellation of the contract; Klockner's certified letter of January, 1975, which refers to Schafroth's oral cancellation of the contract; Schafroth's telephone complaints prior to November 7, 1974; the notice given to Klockner personnel at the November 7, 1974, meeting as testified to by Schafroth and two other witnesses; and, Sander's testimony of an offer of a double annealing allowance on 6.35 mm rods at the November 7 meeting. We are unpersuaded by these claims of error.

The court's finding that Federal attempted to cancel p.o. 5836 is not inconsistent with its holding that Federal gave no notice of any alleged defects in the rods, when it is remembered that the trial court held that the October 10 shipment was made under p.o. 5826 (amended). Thus any attempted cancellation of p.o. 5836 was unrelated to the October 10 rods, and cannot give rise to any inference that those rods were defective or that Federal gave notice to Klockner to that effect. These oral attempts at cancellation are rather highly consistent with the trial court's version of the facts, in which Federal attempted to cancel p.o. 5836 *following* the precipitous decline in rod prices, and repudiated and anticipatorily breached that contract when Klockner indicated it would perform in accord with its provisions.

Nor is the court's conclusion against the weight of the evidence. Sander's testimony, the Klockner letter, and Schafroth's telephone calls prior to November 7 all support the finding that Federal attempted to cancel p.o. 5836, which had not yet been received. As to the testimony of the Federal witnesses concerning the November 7 meeting, the court found Schafroth's testimony incredible. The court remarked:

Accepting for argument's sake, the fact that the 1,000 tons, were, in fact, order 5836, and were, in fact defective, the Court finds it beyond belief that five days later, on November 12, 1974, Federal made a check to Klockner for $504,853.98 (apparently, according to Federal's version, for the 1,000 defective tons already delivered under # 5836).[3]

Neither is there sufficient support in the testimony of the two other Federal witnesses who testified about the November 7 meeting to overturn the trial court's finding. The court found them "credible," but rejected their testimony as based in large part upon information supplied to them by Schafroth. We agree. Cross-examination of the Federal witnesses made it clear that their testimony was largely based on prior testimony in the trial, or upon information as to p.o. numbers the witnesses had received from Schafroth, rather than upon their own recollection of the events of the 1974 meeting. There was also testimony to the contrary, which the trial court credited, from Mainz and Sander. There was no written documentation of any written notice to Klockner nor indeed, of any defect in the rods. There was also evidence that the annealing allowance Federal relies upon to demonstrate Klockner's knowledge of the defects in the 6.35 mm rod was in fact proposed by Schafroth as a possible method of reducing the price on the as yet unshipped p.o. 5836.

We thus find substantial support in the record for the trial court judge's findings.

---

**3.** Even were we to accept Federal's contention that it notified Klockner of the defects at the November 7 meeting, Klockner would have been justified in believing that full payment of half a million dollars five days later constituted an acceptance of the rods under Ill.Rev.Stat. ch. 26, § 2–606(1)(a), which provides that acceptance occurs when a buyer signifies to the seller that he will retain nonconforming goods in spite of their nonconformity. Section 2–607(3)(a) requires that notice of breach be pro-

vided *after* the acceptance. *Genuine Panama Hat Works, Inc. v. Paragon Hat Co.*, 245 Ill. App. 531, 540 (1927), cited with approval in Illinois Code Comment, Ill.Ann.Stat. ch. 26, § 2–607(3)(a) (Smith-Hurd). It is conceded that Federal made no contact with Klockner following the November 12 payment. Thus, any defense or recovery on the counterclaim would be barred under § 2–607(3)(a) in any event.

**1380**

We are left with the firm conviction that he properly evaluated the credibility of the witnesses and entered appropriate findings of fact on that basis on the issue of notice. We hold, therefore, that the trial court properly ruled that any defense or counterclaim based on breach of warranty was barred by § 2–607(3)(a), Ill.Rev.Stat. ch. 26. In light of that holding, we need not reach any issue of whether the court ruled properly on whether the October 10 shipment of rods was in fact in breach of any express or implied warranty.

## V. Damages.

■ The trial court judge computed Klockner's damages under U.C.C. § 2–708, Ill.Rev.Stat. ch. 26, § 2–708, which provides that the measure of damages is the difference between the contract price and the market price at the time and place of delivery plus any incidental damages. He relied on evidence that Klockner had made nine sales of the repudiated rods between June and October 1975 at an average price of $11.00 per hundredweight, which was $12.75 less than the contract price. That resulted in damages of $505,960.63. The court also added incidental storage damages of $12,050.97, and interest of 5% per annum, pursuant to Ill.Rev.Stat. ch. 74, § 2, for a total judgment amount of $658,306.40.

Federal asserts that this computation grossly overstates the damages. Federal contends that the court erroneously assumed that the price received by Klockner was the market price at the time and place for tender, and that the market price should have been set at the market price in November, 1974 in Herrin, Illinois, which was established by the price Federal was obliged to pay for replacement rods. It also challenges the award of the storage charges from November 1974 to January 1975, on the ground that the rods were not tendered, at Klockner's choice, until that latter date. Federal also asserts that no damages at all should have been awarded for the 1,000 tons of rods which remained in Germany, since Klockner never took title to those rods, and never tendered them to Federal.

Even if some amount were awarded for the untendered rods, Federal claims it should be either limited to Klockner's lost profits on the rods, or reduced by the amount of the reduction in price Klockner received from the manufacturer on account of Federal's repudiation.

### A. The Calculation of the Market Price and Incidental Damages.

Section 2–610(a) of the Uniform Commercial Code, Ill.Rev.Stat. ch. 26, § 2–610(a), provides:

> When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may
>> (a) for a commercially reasonable time await performance by the repudiating party . . .

The determination of what constitutes a commercially reasonable time is a question of fact, and we do not find error in the trial court's computation of the market price by reference to Klockner's sales from June to October 1975. There was evidence that Federal disposed of the allegedly defective rod at $10.50 per hundredweight, and that that price was within the market range during the relevant time period. Assessment of the price at the more generous price of $11.00 per hundredweight is also within the market range, and accurately pegs Klockner's actual loss on the resale of the repudiated rods. We thus find no error in the computation of the market price.

Nor do we find error in assessment of the storage charges. Federal's repudiation of the rods occurred in November. Klockner had the rods at Memphis ready for delivery, clearly intended to deliver them beginning at that time, and would have done so but for Federal's anticipatory repudiation. In those circumstances it was not error for the trial court to award incidental damages for storage.

### B. Damages on the 1,000 Tons Remaining in Germany.

As a preliminary matter we note that the entire contract amount was clearly ten-

dered to Federal at the very latest by Klockner's letter of January 22, 1975. This was sufficient tender under Illinois law, *Norton Iron Works v. Wilson Steel Products, Co.*, 232 Ill.App. 523 (1924) (decided under USA § 51; 2–503 continues same policy, Illinois Code Comment § 2–503, Ill.Ann. Stat. ch. 26, § 2–503 (Smith-Hurd)). *Denison Mines, Ltd. v. Michigan Chemical Co.*, 469 F.2d 1301 (7th Cir. 1972), relied on by Federal, is inapposite for there it was determined that, unlike this case, no tender had been made and recovery was barred on that basis.

 Nor are we convinced by Federal's claim that Klockner never assumed title to the goods. There is no evidence in the record that Klockner did not assume title, and, in any event, the letter of January 22, 1975, shows that Klockner was, in the words of the *Norton Iron Works* court, " 'ready and willing to deliver the goods.' That is all the statute requires." 232 Ill.App. at 530. This is a sufficient basis to warrant the trial court's award of damages for the whole amount of the contract.

Finally we conclude the court did not err in not reducing the amount of damages by the manufacturer's reduction in price to Klockner following Federal's breach. This issue is well-settled under Illinois sales law. *See* Illinois Code Comment, Ill.Ann.Stat. ch. 26, § 2–708 (Smith-Hurd) (citing with approval *Kadish v. Young*, 108 Ill. 170 (1883)).

### VI. Conclusion.

We therefore conclude, for all the aforementioned reasons, that the trial court did not err in ruling in favor of Klockner and against Federal, and awarding damages of $658,306.40. The judgment is, therefore,

Affirmed.